A94A1193, A94A1194. KEMIRA, INC. v. WILLIAMS
INVESTIGATIVE & SECURITY SERVICES, INC. et al.; and
vice versa.
(450 SE2d 427)

MCMURRAY, Presiding Judge.

Plaintiff Williams Investigative & Security Services, Inc. ("Williams Investigative") and its president, plaintiff Tim Williams, brought this contract action against defendant Kemira, Inc. According to the amended complaint, Williams Investigative and defendant "entered into a 'subcontract for project security services.' . . . Pursuant to the contract, [Williams Investigative provided] personnel and other related services and undertakings for security on the plant and property of [defendant] in Chatham County, Georgia. Over the course

of the contract . . . varying levels of personnel, supporting equipment and services were provided by [Williams Investigative] with [defendant] retaining the right to specify its demands and requirements from time to time." On October 18, 1989, defendant's Corporate Safety Manager, "Joseph E. Clonts, . . . gave written notice to [Williams Investigative] of a reduction . . ." in defendant's need for future security services. Tim Williams "communicated with Clonts regarding the status of the contract and future services to ascertain whether it would be terminated [and further . . .] ascertain what contractual and other commitments [Williams Investigative] must continue in order to be able to provide services required of it under the contract [such as . . .] office space, vehicles, insurances, and employee staff levels." In a letter dated March 19, 1990, Clonts purportedly "represented that [Williams Investigative's] engagement would continue." Alleging that defendant "has never given notice of termination as required under Section 15 of the contract[,]" Williams Investigative demanded contractual damages as well as OCGA § 13-6-11 attorney fees. Williams Investigative further sought to recover expenses it incurred and profits it anticipated as a result of its detrimental reliance on defendant's assertions of continued security work, alleging that defendant "should be estopped from relying upon provisions in the contract limiting its liability." As a separate claim, Tim Williams sought to recover $142,329 he allegedly loaned Williams Investigative between January 3, 1990, and August 28, 1990, on the ground that "[b]ut for the representations and assurances by Kemira, through Mr. Clonts, Mr. Williams and [Williams Investigative] would not have procured and expended these funds."

Defendant denied the material allegations, arguing that "the contract provided for the work to be performed during a specific construction project and the conclusion of the construction project effectively terminated the contract." The case was tried before a jury. Answering special interrogatories, the jury found in favor of Williams Investigative "based upon the written agreement," awarding $28,345 in contractual damages. The jury found for defendant on a claim of fraud but found in favor of plaintiffs on a claim of promissory estoppel, awarding them $5,000. The jury disallowed punitive damages but awarded $10,000 in attorney fees. In Case No. A94A1193, defendant appeals from the judgment entered on the jury's verdict and, in Case No. A94A1194, plaintiffs cross-appeal. *Held*:

## Case No. A94A1193

1. In its first enumeration, defendant contends the trial court erred in denying its motion for directed verdict as to any claim for damages for breach of the written contract "on the grounds that the

evidence [of damages] was conclusory and the amount sought was not proved to a reasonable certainty and because the proper foundation had not been laid." A directed verdict is authorized only "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. . . ." OCGA § 9-11-50 (a).

(a) Defendant objected to plaintiffs' Exhibit 13-A, a document allegedly showing plaintiffs' actual monthly income and expenses, on the ground that "unless the supporting documents are in evidence, we object to it as being a conclusion." The following then transpired: "THE COURT: I think he can testify to those on there, but I don't believe it's admissible in evidence to the jury. [PLAINTIFFS' COUNSEL]: Okay, we would like to tender it and then it's objected and ruled out; is that correct? THE COURT: Yes." Tim Williams then testified without objection that Williams Investigative had an average monthly profit of $28,435, based on his knowledge of actual revenues and expenses for the preceding seven-month period. Nevertheless, at the close of the evidence, the trial court ultimately admitted plaintiffs' Exhibit 13-A.

" 'All evidence is admitted as of course, unless a valid ground of objection is interposed, the burden being on the objecting party to state at the time some specific reason why it should not be admitted. A failure to make such objection will be treated as a waiver, and prevent the court, on a motion for a new trial, from inquiring as to the competency of the evidence.' *Andrews v. State,* 118 Ga. 1 (43 SE 852)." *Hall v. Browning,* 71 Ga. App. 835 (3) (32 SE2d 424). In the case sub judice, "[n]o timely and specific objection was posed at trial to [Tim Williams'] testimony concerning [average monthly profits]. Thus, any foundation objection thereto was waived. *Patton v. Bank of LaFayette,* 124 Ga. 965 (7) (53 SE 664); *McGee v. State,* 205 Ga. App. 722, 726 (9) (423 SE2d 666)." *Truck Parts &c. v. Rutledge,* 211 Ga. App. 166 (1) (438 SE2d 404).

(b) Nevertheless, defendant contends the trial court should have granted its motion for directed verdict because Tim Williams' testimony as "proof of damages without supporting data is unclear."

Section 15 (C) of the written subcontract provided: "Upon termination, Subcontractor shall be entitled to be paid the value, including a reasonable allowance for [Subcontractor's] profit, calculated on the basis of the compensation provisions [of the subcontract], of all Work properly done by Subcontractor together with reasonable costs occasioned by such termination and not previously paid for. . . ." In support of Williams Investigative's claim for 30 days' lost profits, Tim Williams testified as to his familiarity with Williams Investigative's monthly billings and expenses, identifying specifically that percentage of overhead attributable to work at defendant's plant in Savannah,

Georgia. He calculated "the average profit during this time . . . was $28,435 a month. That's gross profit." This figure was "derived from looking at the revenues versus the expenses associated with the Kemira contract."

OCGA § 13-6-2 provides: "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." In the case sub judice, the contract expressly contemplated a "reasonable allowance for [Subcontractor's] profit, calculated on the basis of the compensation provisions. . . ." Pursuant to Appendix A of the subcontract, Kemira would pay a fixed hourly rate, an additional fee of ten percent for "Supervision and Administration," a fixed weekly allowance for vehicle rental, as well as "exact cost" reimbursement for materials, equipment, and expenses. Since this contract contemplated both fixed and variable costs, it was not necessary to prove to an "exact computation" the "reasonable allowance for [Subcontractor's] profit" element of contractual damages. Compare *Bennett v. Associated Food Stores,* 118 Ga. App. 711, 714 (2) (165 SE2d 581).

Furthermore, "a distinction is to be drawn between illegal testimony and secondary evidence or other evidence which is legal in itself because it is of probative value but is inadmissible until the proper foundation for its reception has been laid. Hearsay testimony has no probative force whatsoever ([cit.]), and its only effect is to prejudice the party against whom it is offered. Evidence of a secondary nature, the only objection to which is that it was received without the preliminary foundation for its introduction being first laid, stands upon an altogether different footing; and if admitted without objection, it is to be treated as altogether competent, and the court may properly instruct the jury as to its relevancy and legal weight and effect. [Cit.]" *Patton v. Bank of LaFayette,* 124 Ga. 965, 973 (7), 974, supra. In the case sub judice, "a prima facie case [was] made by . . . plaintiff where oral evidence concerning [one month's anticipated profit was] introduced without objection [even if the] documents setting forth the [arithmetical basis for that calculation] are not received in evidence. *Thomas &c. Lumber Co. v. Atlantic Mill &c. Co.,* 24 Ga. App. 749 (2) [(102 SE 135)]. See also *Rothstein v. Mirvis & Fox, Inc.,* 155 Ga. App. 79, 80 (2) (270 SE2d 301)." *Professional Ins. Svc. v. Sizemore Elec. Co.,* 188 Ga. App. 463 (1) (373 SE2d 276). "In the absence of legal error, an appellate court is without jurisdiction to interfere with a verdict supported by some evidence, even where the verdict may be against the preponderance of the evidence. *Thompson v. Hill,* 143 Ga. App. 272, 276 (238 SE2d 271)." *Mizell v. Spires,* 146 Ga. App. 330, 331 (1) (246 SE2d 385). Consequently, the trial court did not err in refusing to direct the verdict against Williams Investigative's claim

for contractual damages.

2. Next, defendant contends the trial court erred in failing to direct the verdict as to the claim of a promissory estoppel "because the purported promise was to perform an act in the future."

In support of the claim of promissory estoppel, plaintiff submitted the March 19, 1990, letter of Mr. Clonts which purportedly confirmed his previous oral representations that Williams Investigative would be hired for a new building project defendant (or a related corporation) was about to commence. This letter was prepared by Mr. Clonts at the behest of plaintiff Tim Williams, who "requested a letter to obtain [a] bank loan. . . ." The letter is addressed: "TO WHOM IT MAY CONCERN . . ." and refers to the anticipated "construction of a water treatment chemicals plant[; . . . that defendant expects] that, with their level of expertise, we will again call on [Williams Investigative] to assist us. . . . It is expected that a contract will be negotiated based on their excellent past performance . . .[; that the] proposed contract is expected to last approximately twelve (12) to fourteen (14) months . . .[; and that the hourly rate] is a negotiable figure that will be addressed closer to actual contract negotiations and its consummation."

"A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement, Second, Contracts, § 2 (1). However, "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise. Although such words are often referred to as forming an illusory promise, they do not fall within the present definition of promise. They may not even manifest any intention on the part of the promisor. Even if a present intention is manifested, the reservation of an option to change that intention means that there can be no promisee who is justified in [the] expectation of performance." Restatement, Second, Contracts, § 2, Comment (e).

In the case sub judice, there is considerable doubt whether Mr. Clonts' letter is anything more than a nonbinding statement of intent to negotiate an agreement in the future. However, Ms. Barbara Royal, a sergeant and shift manager for Williams Investigative during the Kemira project, related a specific promise of future employment made by Mr. Clonts to Mr. Williams in her presence. Mr. Clonts "was very emphatic about saying that there was a second contract coming, that we would handle the security for this project, but miscellaneous paper work and a permit was holding him up as far as giving us a date."

"[P]ursuant to OCGA § 13-3-44 (a): 'A promise which the promisor should reasonably expect to induce action or forbearance on the

part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' This statute is a codification of the principle of 'promissory estoppel,' which principle relates to the sufficiency of the consideration to enforce a promise. See *Pepsi Cola Bottling Co. v. First Nat. Bank*, 248 Ga. 114, 116 (2) (281 SE2d 579) (1981). The principle of promissory estoppel merely provides that, in certain circumstances, the reliance by the promisee or third party upon the promise of another is sufficient consideration, in and of itself, to render the executory promise enforceable against the promisor. See generally *Irvin v. Lowe's of Gainesville*, 165 Ga. App. 828, 830 (302 SE2d 734)." *Loy's Office Supplies v. Steelcase*, 174 Ga. App. 701, 702 (331 SE2d 75). "If a promise within the terms of [OCGA § 13-3-44 (a)] is in terms conditional or performable at [some] future time the promisor is bound thereby, but performance becomes due only upon the occurrence of the condition or upon the arrival of a specified time." Restatement, Second, Contracts, § 91. Consequently, the fact that defendant's purported promise was both performable in the future and conditioned on a future event would not preclude the application of promissory estoppel. *Insilco Corp. v. First Nat. Bank of Dalton*, 248 Ga. 322 (283 SE2d 262).[1] The trial court did not err in failing to direct a verdict as to plaintiffs' claim based on promissory estoppel on the ground that Clonts' promise of employment was performable in the future.

3. In its third enumeration, defendant contends the trial court erred in failing to direct the verdict against plaintiffs' claim for OCGA § 13-6-11 attorney fees, arguing that it had "reasonable grounds to contest liability and was not stubbornly litigious. . . ."

According to Ms. Barbara Royal, Mr. Clonts informed her before March 17, 1990, that "he had taken a lot of harassment, ridicule, from his peers at Kemira for having Mr. Williams handle the security for Kemira, and that he wouldn't take that kind of criticism anymore. . . . And I said, 'But, you know, what about the project?' and he says — and I said, 'What about Mr. Williams' business. [PLAINTIFFS' COUNSEL]: Did he say anything about whether he would get another job, or comment on that? [MS. ROYAL]: Well, from the con-

---

[1] In *Insilco*, the Georgia Supreme Court reversed the Court of Appeals which had held "since [plaintiff's] acquiescence related to a future time we find no estoppel. *Fields v. Continental Ins. Co.*, 170 Ga. 28 (2) (b) (152 SE 60) (1929)." *Insilco Corp. v. First Nat. Bank of Dalton*, 156 Ga. App. 382, 383 (1) (274 SE2d 767). As the holding of *Fields v. Continental Ins. Co.*, 170 Ga. 28 (2) (b), supra, regarding estoppel by representation, does not control whether the principle of promissory estoppel as enacted at OCGA § 13-3-44 (a) applies, the continuing viability of *Reuben v. First Nat. Bank of Atlanta*, 146 Ga. App. 864, 866-867 (247 SE2d 504) on this issue must be questioned. Accordingly, defendant's reliance thereon is not well-founded.

versation, it was quite evident that he had no intention of giving Mr. Williams another contract or project."

"The expenses of litigation generally shall not be allowed as a part of the damages; but where . . . the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." OCGA § 13-6-11. "[T]he elements of bad faith which will authorize expenses of litigation in an ex contractu action are those acts relative to the conduct of entering into a contract or to the transaction and dealings out of which the cause of action arose ([cits.]), but do not have reference to the motive with which the defendant defends an action after a cause of action has occurred. [Cit.]" *Edwards-Warren Tire Co. v. Coble*, 102 Ga. App. 106, 111 (2), 113 (115 SE2d 852). In the case sub judice, Ms. Royal's testimony is proof that Mr. Clonts had no intention of retaining Williams Investigative for future security services only days before he wrote a "TO WHOM IT MAY CONCERN" letter proclaiming defendant's expectation "that, with their level of expertise, we will again call on [plaintiffs] to assist us with the Kemira Kemi project." This is some evidence that defendant acted in bad faith in the transaction and dealings out of which the cause of action arose and authorized the jury's award of OCGA § 13-6-11 attorney fees, despite any bona fide dispute as to liability or damages. *Ballenger Corp. v. Dresco Mech. Contractors*, 156 Ga. App. 425, 433 (3) (274 SE2d 786). The trial court did not err in denying defendant's motion for directed verdict as to this claim.

### Case No. A94A1194

4. The affirmance of the judgment in the main appeal, Case No. A94A1193, renders moot all issues raised in this cross-appeal. Accordingly, the appeal in Case No. A94A1194, plaintiffs' cross-appeal, "is hereby dismissed pursuant to OCGA § 5-6-48 (b) (3)." *Kubler v. Goerg*, 197 Ga. App. 667, 671 (5) (339 SE2d 229).

*Judgment affirmed in Case No. A94A1193. Cross-appeal dismissed in Case No. A94A1194. Pope, C. J., and Smith, J., concur.*

DECIDED OCTOBER 18, 1994 —
RECONSIDERATION DENIED NOVEMBER 14, 1994 —

*Clark & Clark, Fred S. Clark*, for appellant.
*Karsman, Brooks & Callaway, Stanley E. Harris, Jr.*, for appellees.