A99A1420. DPLM, LTD. v. J. H. HARVEY COMPANY.
(526 SE2d 409)

POPE, Presiding Judge.

DPLM, Ltd. brought suit against J. H. Harvey Company (Harvey's) for damages incurred when Harvey's chose not to expand its existing grocery store in a DPLM-owned shopping center, but instead chose to close the store. Because we find that jury questions exist as to whether DPLM reasonably relied upon any promises by Harvey's regarding the expansion of its store, we reverse the trial court's grant of summary judgment to Harvey's on DPLM's claim of promissory estoppel. But because we find that the parties' lease does not contain an implied covenant of continuous operation and thus that Harvey's has not breached its lease in vacating the store, we affirm the trial court's grant of summary judgment to Harvey's on that claim. We also reverse the trial court's grant of Harvey's motion for summary judgment on the issue of attorney fees.

Harvey's operates a number of grocery stores and in 1989 entered into an amended lease with DPLM on its existing store in Americus. That store was located in the Bel-Air Plaza shopping center, which was owned and operated by DPLM. Beginning in 1991 or 1992, the parties began discussing the possibility that Harvey's might enlarge its Bel-Air Plaza store. As these discussions continued over the next few years, the parties discussed various options for the size, layout and location of the expansion.

In 1995 DPLM began to take steps to facilitate the proposed store expansion. These steps included notifying several existing tenants in Bel-Air Plaza that DPLM would be unable to renew their long-term leases, relocating at least one tenant, refusing other prospective tenants, purchasing options on adjoining property, conducting various surveys and analyses, negotiating with the city to postpone required landscaping and cooperating with Harvey's architect in obtaining a variance. DPLM kept Harvey's informed of many of the actions it was taking.

By February 14, 1996, Harvey's authorized its attorney to sign a letter of intent, setting forth the "basic terms and conditions of the new, proposed lease" on a 33,000-square-foot store in Bel-Air Plaza. On April 5, 1996, however, Harvey's offered a "modification" and indicated that it was willing to enter into "lease negotiations" for a 39,500-square-foot store. Harvey's later prepared a draft lease for DPLM's consideration. DPLM proposed a number of changes to the

draft lease, and the parties continued to negotiate the terms of the lease, as well as how the expansion would be structured and financed. And Harvey's was still considering various sizes and layouts for the proposed store. Despite DPLM's repeated requests to conclude the negotiations, the parties never signed a lease for the proposed expansion.

Instead, on or around October 16, 1996, Harvey's notified DPLM that it was considering the purchase of two existing grocery stores in Americus, and several weeks later, on November 12, 1996, it closed its Bel-Air Plaza store and moved to the newly purchased locations. Harvey's has continued to pay the base rent, and a pro rata share of other obligations under the lease on its Bel-Air Plaza store, but discontinued any rent payments based upon percentage sales. And the Bel-Air Plaza location has remained vacant.

DPLM's complaint sought reimbursement of the expenses it incurred in preparing for the proposed expansion, as well as damages it claims to have incurred as a result of Harvey's abandoning Bel-Air Plaza. The trial court granted summary judgment to Harvey's, and DPLM appeals from that order.

1. While DPLM acknowledges that the parties never finalized their negotiations or signed a lease on an expanded store, it argues that questions of fact remain as to whether Harvey's is liable under the theory of promissory estoppel. DPLM is correct that the doctrine of promissory estoppel can provide a basis for enforcing a promise even in the absence of a binding contract:

> The principle of promissory estoppel merely provides that, in certain circumstances, the reliance by the promisee or third party upon the promise of another is sufficient consideration, in and of itself, to render the executory promise enforceable against the promisor.

*Loy's Office Supplies v. Steelcase, Inc.*, 174 Ga. App. 701, 702 (331 SE2d 75) (1985). Thus, the fact that the parties did not enter into a binding lease agreement, in and of itself, does not preclude DPLM's claim under promissory estoppel. See *Augusta Surgical Center v. Walton &c. Office Venture*, 235 Ga. App. 283, 286 (2) (508 SE2d 666) (1998).

"Promissory estoppel claims are extremely fact specific and are not susceptible to application of general rules." (Punctuation omitted.) *Kent v. Brown*, 238 Ga. App. 607, 612 (2) (f) (518 SE2d 737) (1999). And because the appeal in this case is from the trial court's grant of summary judgment, we must view the facts in the light most favorable to DPLM. *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 286 (1) (521 SE2d 207) (1999). To establish its claim for promis-

sory estoppel, DPLM must show that (1) Harvey's made a promise regarding the expansion of their Bel-Air Plaza store; (2) Harvey's should have expected that DPLM would rely on the promise; (3) DPLM did in fact rely upon that promise to its detriment; and (4) injustice can be avoided only by enforcement of the promise. See id.; *Kamat v. Allatoona Fed. Sav. Bank*, 231 Ga. App. 259, 264 (3) (498 SE2d 152) (1998).

The first issue, therefore, is whether Harvey's made any promises in the course of the parties' negotiations. This Court has accepted the Restatement definition of a promise: "A promise is a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Kemira, Inc. v. Williams Investigative &c. Svcs.*, 215 Ga. App. 194, 198 (2) (450 SE2d 427) (1994), quoting Restatement, 2d, Contracts, § 2 (1).

In support of its claims that Harvey's did make certain commitments, DPLM points to a series of correspondence between the parties beginning in 1992. The first letter in the series, dated April 21, 1992, from Harvey's representative indicates that Harvey's is "still interested" in expanding its Bel-Air Plaza store. The next letter, dated March 29, 1993, states that Harvey's is "very interested in expanding the Americus store and [it] is one of our top priorities." DPLM also points to Harvey's February 14, 1996 letter of intent, which set out the terms of a proposed lease, and a letter from Harvey's enclosing a copy of a proposed lease.

In addition to this correspondence, DPLM's general partner testified that Harvey's president had stated on several occasions that Harvey's wanted to move forward with the project and on at least one occasion directed them to "move ahead." Moreover, a DPLM memorandum indicates that in October 1995, Harvey's president may have authorized DPLM to begin plumbing work in an area of the shopping center that had been vacated by other tenants and that would be encompassed by the then-existing plan for the proposed expansion.

While Harvey's continued to vacillate on the size and design of the new store and no definite plan was approved, we conclude that this evidence raises a jury question as to whether Harvey's made any promises relating to the expansion of its Bel-Air Plaza store upon which it should have expected DPLM to rely.

Closely related to this issue is the question of whether the steps DPLM took to prepare for the proposed expansion were made in reliance upon any promises by Harvey's. Because promissory estoppel is an equitable doctrine, DPLM must show that its reliance was reasonable and not based upon DPLM's own preconceived ideas:

> This means that the plaintiff relied exclusively on such promise and not on his or her own preconceived intent or

knowledge; that the plaintiff exercised due diligence, so as to justify reliance as a matter of equity; and that there was nothing under the circumstances which would prevent the plaintiff from relying to his detriment.

*Simpson Consulting v. Barclays Bank*, 227 Ga. App. 648, 657 (5) (490 SE2d 184) (1997). Therefore, while there is no question that DPLM took a number of steps in anticipation of the proposed expansion and that Harvey's was aware of some or all of these steps, DPLM bears the burden of showing it took action in reliance upon a promise by Harvey's and not based upon its own expectations.

Harvey's argues that DPLM cannot meet this burden and cites to what it asserts is the closely analogous case of *Doll v. Grand Union Co.*, 925 F2d 1363 (11th Cir. 1991) (construing Georgia law). While that case is not binding authority, the facts are sufficiently similar to merit a closer analysis. In *Doll*, Grand Union was negotiating the lease of space for a grocery store in a proposed shopping center owned by a real estate development partnership. Grand Union sent the partnership a letter stating that its real estate board had approved the project and laying out the basic terms the parties had negotiated up to that point. The letter went on to state, however, that the board's approval was conditioned upon three contingencies and further that the parties' agreement was conditioned upon the resolution and execution of a " 'mutually agreeable lease document.' " Id. at 1365. The parties' negotiations ended, however, when one of the contingencies — ensuring easy access to the shopping center — fell through because the Georgia Department of Transportation decided to put a median down the center of the road in front of the development, which would prevent shoppers from turning left into the planned shopping center. The partnership sued Grand Union to recover losses sustained when it refused to enter into a lease. Id. at 1366.

After determining that the parties had not entered into a binding agreement to sign a lease, the Eleventh Circuit considered the partners' promissory estoppel claim. It held that because the parties had agreed to the essential terms of the lease, there was sufficient evidence of a promise to withstand summary judgment. *Doll v. Grand Union Co.*, 925 F2d at 1371. The court later concluded that Grand Union had, in fact, made certain promises:

Grand Union did indeed make promises to the partners. It promised them it was interested in leasing space in their development. It promised them that it planned to pursue negotiations. It promised them that it had every intention of finalizing an agreement with them.

Id. at 1373. Nevertheless, the court found that summary judgment was proper because the partnership could not prove reasonable reliance in light of Grand Union's consistent assertion, in its letter of intent and its proposed draft lease, that it "had no intention of becoming obligated until the lease was drafted, approved, and signed by both parties." Id. The Eleventh Circuit concluded that Grand Union had done everything it could to protect itself against liability during the course of negotiations by placing conditions on the deal, and that these conditions prevented the partnership from relying upon Grand Union's promises. Id. Moreover, the court noted that the parties' negotiations broke down not because of any actions by Grand Union, but due to the independent actions of a third party that negated one of the essential elements of the parties' agreement. Id.

Although the facts in *Doll* are quite similar to those in this matter, the cases are distinguishable in important respects. While the record in this case contains evidence that both parties considered it important to reach a final agreement on the store expansion before proceeding further, Harvey's did not make this an explicit condition to its making a commitment to the project. According to the record before us, Harvey's made no written condition in its letter of intent, or elsewhere, stating that it would not be bound until the agreement was finalized, nor did it spell out any specific contingencies that had to be met. Instead, the February 1996 letter of intent simply sets out in a straightforward manner the basic terms of the parties' agreement. And although the parties continued to discuss various "modifications" to this agreement, the later correspondence contains no explicit reference to any conditions. Thus, in contrast to the *Doll* case, a jury might conclude that Harvey's did *not* do everything it could to protect itself against liability and thus that DPLM could have reasonably relied on its representations. Moreover, unlike *Doll*, the negotiations in this case broke down not due to factors beyond the parties' control, but rather due in large part to Harvey's own indecisiveness as to the final design for the store.

Instead, we find instructive the Supreme Court of Georgia's decision in *20/20 Vision Center v. Hudgens*, 256 Ga. 129, 135 (7) (345 SE2d 330) (1986). As in this case, the parties had negotiated terms and exchanged revisions to a proposed draft lease. But one of the parties, the landlord, later attempted to change a previously agreed-upon term. The landlord never signed the proposed lease and instead indicated that he had found another tenant who would pay a higher rent and who would not require as many changes to the property. Id. at 131. The Supreme Court held that although the tenant could not enforce the proposed lease, triable issues of fact existed on the issue of promissory estoppel. Id. at 135 (7).

Similarly, we conclude that the record in this case creates triable

issues as to whether DPLM reasonably relied upon any promise by Harvey's in taking steps to prepare for the expansion. See *Augusta Surgical Center v. Walton &c. Office Venture*, 235 Ga. App. at 286 (2).

2. DPLM next contends that the trial court erred in granting summary judgment on its breach of contract claim because issues of fact remain as to whether the parties' existing lease agreement contains an implied covenant of continuous operation. The construction of a contract, however, is generally a matter of law for the court, unless the court determines that ambiguities remain after the appropriate rules of construction are applied. *Asian Square Partners v. Ly*, 238 Ga. App. 165, 166 (1) (518 SE2d 166) (1999). Moreover, courts will introduce terms into a contract only when the term does not conflict with any express provision of the agreement and "where there arises from the language of the contract itself, and the circumstances under which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties." (Citations and punctuation omitted.) *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. 148, 149 (1) (304 SE2d 365) (1983).

Georgia courts have discussed several factors which should be considered in determining whether an implied covenant of continuous operation exists, including: (1) whether the lease provides the tenant can use the premises in any other lawful manner; (2) whether the lease is freely assignable; and (3) whether the lease contains a provision that the tenant pays a percentage of revenue as rent. See *Piggly Wiggly Southern v. Heard*, 261 Ga. 503 (405 SE2d 478) (1991); *Forehand v. Perlis Realty Co.*, 198 Ga. App. 165 (400 SE2d 644) (1990); *Kroger Co. v. Bonny Corp.*, 134 Ga. App. 834 (216 SE2d 341) (1975).

In their 1989 amendment the parties "ratified and confirmed" various provisions of an amended lease signed in 1969 by their predecessors in interest: Colonial Stores, Inc. as tenant and Martha Dykes as landlord. The provision in that lease governing the use of the premises provides:

> Anything in this lease to the contrary notwithstanding Colonial shall open and use the premises for a food supermarket, and not otherwise. Thereafter, if Colonial elects, it may use said premises for any lawful purpose that does not conflict with any then existing negative or affirmative covenant as to use which the Landlord had made with another tenant in said shopping center.

Colonial, therefore, was required to open and operate a grocery store, but at any later time it, and Harvey's as its successor, could elect to use the premises for "any lawful purpose." The lease further provides

that Harvey's could transfer and assign the lease, or sublet the premises, without DPLM's permission so long as it caused no conflict with the business of other tenants. If Harvey's did make such an assignment, however, it remained liable for rent payments. The lease also gave Harvey's the right to remove any fixtures it had installed in the premises "at any time."

Nothing in these provisions, therefore, expressly required Harvey's to maintain its grocery store on the premises, but instead the provisions "weigh[ ] strongly against a construction of the contract which would require the tenant to continue its business throughout the term." *Piggly Wiggly Southern v. Heard*, 261 Ga. at 504. See also *Kroger Co. v. Bonny Corp.*, 134 Ga. App. at 837 ("The lease must be read in the light of what is omitted as well as what is required.").

But we must also consider the rental provisions of the lease, which required Harvey's to make payments of one percent of its gross sales in excess of $4,005,540, in addition to a set monthly base rent. As a general rule, courts will not infer a covenant of continuous operation where the lease provides for the payment of both a percentage of gross receipts and a "substantial minimum" rent. *Kroger Co. v. Bonny Corp.*, 134 Ga. App. at 839. The Supreme Court of Georgia has held that a base rent constituting only 47 percent of the total rental payment could be considered a substantial minimum base rent, suggesting "the absence of an implied covenant of continuous operation." *Piggly Wiggly Southern v. Heard*, 261 Ga. at 504.[1]

Here, the record reflects that the base portion of the rent was around 54 percent of the total rent Harvey's has paid since 1982 and approximately 50 percent of the rent paid since the parties signed the 1989 lease amendment. Under the binding authority of *Piggly Wiggly Southern v. Heard*, therefore, the parties' lease provides for a substantial minimum base rent, which argues against the implication of a covenant of continuous use. Id.

Accordingly, nothing in the lease reflects that the parties agreed to or bargained for Harvey's continuous operation of the premises, "and we are not authorized to rewrite the contract to create such a provision. [Cit.]" *Piggly Wiggly Southern v. Heard*, 261 Ga. at 504-505.

3. DPLM also asserts error in the trial court's grant of summary judgment to Harvey's on its claim for bad faith attorney fees under OCGA § 13-6-11. "Bad faith" in this context means bad faith in con-

---

[1] The Supreme Court's opinion does not discuss specific rent figures, but a more complete discussion of the rental payments may be found in this Court's opinion in the same case. *Piggly Wiggly Southern v. Heard*, 197 Ga. App. 656, 657-658 (1) (399 SE2d 244) (1990). In that opinion, this Court affirmed the trial court's conclusion that the base rent was not a "substantial minimum," but the Supreme Court reversed.

nection with the transaction out of which the claim arose, and not bad faith in defending the claim. *Smith v. Stuckey*, 233 Ga. App. 103, 107 (3) (503 SE2d 284) (1998). Here, there is evidence to show that unbeknownst to DPLM, Harvey's may have been exploring other rental options as early as mid-1996, while at the same time negotiating terms for the Bel-Air Plaza expansion. Moreover, Harvey's would have been exploring these options with full knowledge that DPLM was incurring costs to prepare for the proposed expansion. We find that this evidence is sufficient to raise a jury issue on DPLM's claim of bad faith. See generally *Kemira, Inc. v. Williams Investigative &c. Svcs.*, 215 Ga. App. at 200 (3).

*Judgment affirmed in part and reversed in part. Smith and Eldridge, JJ., concur.*

DECIDED DECEMBER 2, 1999.

*Harper & Barnes, John V. Harper*, for appellant.
*Ellis, Easterlin, Peagler, Gatewood & Skipper, Benjamin F. Easterlin IV*, for appellee.