A03A0130. LEXMARK CARPET MILLS, INC. v. COLOR CONCEPTS, INC.
(583 SE2d 458)

ADAMS, Judge.

Color Concepts, Inc. d/b/a Designer Carpets (Designer) prevailed on a breach of warranty claim relating to certain carpet manufac-

tured by Lexmark Carpet Mills, Inc. (Lexmark). The jury awarded $10,284 for the breach and $27,253 in attorney fees. In this appeal, Lexmark contests only the award of attorney fees. Lexmark contends that the trial court erred by finding its motion for directed verdict was untimely and asserts that the record lacks evidence of bad faith within the meaning of OCGA § 13-6-11. Because we find that Lexmark's motion was not procedurally barred and that the record does not support a finding of bad faith, we reverse.

This litigation arose in the aftermath of Designer's purchase of carpet from Lexmark. When one of Designer's customers selected a specific carpet pattern, sales representative Shelly Levy then contacted Steven Enck, an independent mill representative. Enck phoned Robert A. White, Lexmark's vice president of marketing. After some discussion between Enck and White, Designer placed a custom order for Lexmark's Infinity 831 in a 30-ounce tufted weight. Lexmark produced the carpet and sent Designer an invoice for the purchase price. At the bottom of the invoice was stated, "OUR WARRANTY REQUIRES: . . . (2) That [Carpet & Rug Institute] Installation Procedures be used. (3) That Mill recommended pad be used." The "MILL ONE YEAR LIMITED WARRANTY" on the back of the invoice stated: "[t]his warranty applies only to carpeting properly installed over manufacturer approved pad with the proper density and installed according to [CRI] installation procedures in effect at time of purchase." The warranty provided that "[i]n the event of a manufacturing defect, the manufacturer will furnish replacement carpet, of equivalent quality, for the [a]ffected area at no charge, excluding installation." It is undisputed that when installed, the carpet was glued directly onto a concrete subfloor without a pad. Under the terms of the limited warranty, a purchaser waived incidental and consequential damages.

About eight months after the carpet's installation, complaints arose. On February 15, 1999, Enck notified Lexmark that "[c]ustomer is complaining of very excessive wear and wants mill to inspect ASAP." In response, Lexmark retained an expert, Patrick Richardson, to inspect the carpet. In an inspection report dated March 2, 1999, Richardson concluded: "[t]he carpet is defective due to the loss of twist in the cut pile nylon yarn. The loss of twist has caused the pattern to be lost and resulted in the fiber being crushed, matted and tangled down to one/half its original pile height." On March 5, 1999, Designer demanded a full refund or full assurance that any replacement carpet would perform properly. Designer subsequently also retained Richardson to inspect the carpet. In an inspection report to Designer, dated April 20, 1999, Richardson concluded: "[t]he carpet is defective due to loss of twist and severe fuzzing in the nylon yarn."

Notwithstanding its receipt of Richardson's report and the exis-

tence of the one-year manufacturer's warranty, Lexmark refused to honor its warranty, claiming it was void due to improper installation procedures and a failure to use a mill-recommended pad. Lexmark also rejected the claim on the basis that the crushing and matting being exhibited by the carpet are not considered "manufacturing defects" in the carpet industry. Lexmark attributed the carpet's problems primarily to the selection of a particular carpet not recommended for heavy traffic commercial use or in the corridors of office buildings.

Despite its decision to deny the claim, Lexmark offered to replace part of the carpet in the more heavily trafficked areas at no cost to Designer. Designer rejected Lexmark's offer of approximately 80 yards of carpet, believing that all of the carpet needed to be replaced. To satisfy its customer, Designer had the carpet ripped out and replaced. In a May 3, 1999 letter, Designer demanded that Lexmark pay nearly $16,000, an amount more than three times what Designer had paid Lexmark for the carpet. Designer's demand included incidental and consequential expenses which the warranty did not allow.

After Lexmark refused to accede to its demands, Designer sued Lexmark for, inter alia, breach of contract, negligence, breach of warranty, unjust enrichment, fraudulent concealment, and fraud. Designer sought punitive damages and also attorney fees under OCGA § 13-6-11.

At trial, both sides presented expert testimony. Richardson, appearing on behalf of Designer, testified that the carpet had a manufacturing defect. In his opinion, the installation of a pad "might have slowed it a little, but I think we end up in the same place." Another expert, Reginald Burnett, testified the carpet had "a slight design flaw," not a manufacturing defect. Burnett testified that "I can't say that there was a defect in the sense of a manufacturing defect." While Burnett did not think that a direct glue-down was an appropriate manner of installation for the office area, he also did not believe that the installation was the cause of the carpet's poor performance. Burnett felt that the carpet's weight of 27.7 ounces being "fractionally low" had little, if any, bearing on the carpet's poor performance.

Designer's chairman, David Patterson, testified that "Lexmark was, I think, in one respect very generous to offer to replace the corridors." Patterson explained that he rejected Lexmark's offer because he felt that while the 80 yards offered would help, it was not enough to replace all the carpet. On cross-examination, when asked about the carpet installed in the private offices, Patterson conceded that it was fine, saying, "[i]t had no traffic." Patterson admitted that the mills in Dalton will generally provide replacement carpet, or give a

credit at the mill, but do not customarily pay installation costs. Yet, in his letter dated May 3, 1999, Patterson demanded a prompt check from Lexmark for $15,749 which included $4,819, the original purchase price of the carpet, plus $6,680 for installation costs, and $4,250 for "Modular furniture knock-down/set up." Three exhibits consisted of letters exchanged between Lexmark and Designer from which discussion about compromise and settlement had been redacted.

White, the Lexmark vice president, testified that the carpet at issue is considered a "hospitality carpet," recommended for hotel rooms but not for general office use. White, who ultimately accepted the order, explained that he understood that the carpet was for private offices, not for hallways. Enck, the mill representative, denied telling White that the carpet would be subject to heavy foot traffic. Enck testified that he understood that the carpet would be placed "[i]n the actual offices themselves."

At the close of Designer's evidence, Lexmark obtained directed verdicts on Designer's claims for negligence, fraud, fraudulent concealment, unjust enrichment, and punitive damages. Although Lexmark also moved for a directed verdict on attorney fees, the trial court took the issue under advisement later permitting Designer to reopen the evidence to provide additional testimony on attorney fees. Thereafter, Lexmark renewed its motion for a directed verdict on attorney fees.

At the close of the evidence, the trial court granted Lexmark's motion for directed verdict on the issue of Designer's claim to incidental and consequential damages, finding as a matter of law that the limitation of remedies appearing in Lexmark's invoice formed part of the contract and therefore precluded recovery of such damages. At this point, the trial court had directed verdicts on all of Designer's claims except its breach of warranty claims. Ultimately, the jury found a breach of warranty and awarded attorney fees to Designer.

In its motion for judgment notwithstanding the verdict or in the alternative for new trial, Lexmark argued that the amount of compensatory damages was twice the total authorized by law. Lexmark also claimed that the award of attorney fees was error because the record lacked evidence to support such an award and contained no evidence from which the jury could ascertain with any degree of certainty the amount of time Designer's counsel had spent pursuing the only theory of recovery on which Designer prevailed.

The trial court conditionally granted Lexmark's motion for new trial but only as to compensatory damages, reducing them to $4,980.61. The court decided that Lexmark erred by failing to raise the attorney fees issue by motion for directed verdict at the close of

evidence. The trial court also found "there was evidence from which the jury could infer Lexmark's bad faith in the making or performance of the contract."

1. Lexmark contends that the trial court erred in finding it was required to move for a directed verdict on the issue of attorney fees at the close of all the evidence and not only at the close of Designer's evidence. We agree.

Under OCGA § 9-11-50 (a), "[a] motion for a directed verdict may be made at the close of the evidence offered by an opponent or at the close of the case." As we have previously held, "There is no statutory requirement that a motion for [a] directed verdict be renewed at the end of trial." *GLW Intl. Corp. v. Yao*, 243 Ga. App. 38, 41 (2) (532 SE2d 151) (2000). Therefore, this issue was not waived.

2. Lexmark contends that the award of attorney fees was error because the record lacks evidence of bad faith. Again, we agree.

In opposing Lexmark's motion for a directed verdict on attorney fees, Designer argued that bad faith was proven by the fact that Lexmark had a copy of Richardson's report that the carpet was defective, sat on the report, and "stonewalled." Designer claimed that Lexmark stonewalled "in totally denying a claim thereby forcing [Designer] through this whole ordeal when their own expert told them they had defective carpet." In declining to direct a verdict, the trial court concluded that a jury should resolve the question of bad faith.

As a rule, "[t]he expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." OCGA § 13-6-11. But, "[w]here a bona fide controversy exists, attorney fees may be awarded under OCGA § 13-6-11 only where the party sought to be charged has acted in bad faith in the underlying transaction." (Citation omitted.) *Latham v. Faulk*, 265 Ga. 107, 108 (2) (454 SE2d 136) (1995). In contract actions like this one, the element of bad faith relates to the defendant's conduct in entering into the contract or pertains to the transaction and dealings out of which the cause of action arose, not to the defendant's conduct after the cause of action arose. *Kemira, Inc. v. Williams Investigative &c. Svcs.*, 215 Ga. App. 194, 200 (3) (450 SE2d 427) (1994).

The parties offered conflicting evidence as to whether the carpet was inherently defective or simply performed poorly due to the manner of installation and the choice of a carpet inappropriate for a particular environment. The sole theory that the jury found meritorious was the breach of warranty claim. But, bad faith in a contract case "is not bad faith in refusing to pay but bad faith in the transaction out of

which the cause of action arises. [Cit.]" *Jordan Bridge Co. v. I. S. Bailey, Jr., Inc.*, 164 Ga. App. 124, 125 (5) (296 SE2d 107) (1982).

> [W]hile bad faith does not have reference to a simple refusal to pay a debt which results in requiring a party to employ counsel and institute legal action or to the motive with which the defendant defends the action there may be bad faith in carrying out the provisions of the contract sufficient to support the award, and bad faith in a breach of contract *other than mere refusal to pay a just debt* may authorize the jury to award attorney fees, provided it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.

(Citations and punctuation omitted; emphasis in original.) Id. at 126 (5).

Here, the evidence shows without dispute that when Lexmark learned about the problem, it responded by hiring an independent consultant to inspect the carpet. White testified that "we did not ignore [the complaint]. . . . [W]e decided it was not a valid claim." Although Lexmark offered 80 yards of replacement carpet for the more heavily trafficked hallway, Designer rejected the offer, and according to Exhibit 16, Designer insisted on recovering expenses to which the one-year warranty did not apply, i.e., installation costs and "Modular furniture knock-down/set up." Compare *Shepherd v. Aaron Rents, Inc.*, 208 Ga. App. 139, 144 (4) (430 SE2d 67) (1993) (bad faith in underlying transaction shown where party negotiating sale of business misrepresented ownership interest, failed to disclose that systems inventory was unsaleable, and exhibited dishonesty in dealings with buyer).

In refusing to honor its warranty, Lexmark did so asserting that: crushing and matting are not considered manufacturing defects by the carpet industry; the carpet was installed by direct glue-down without a mill-recommended pad; and the carpet was installed in areas "we never recommended it for." Expert testimony established that crushing and matting are not considered "manufacturing defects" by the carpet industry in general. In fact, Patterson, Designer's chairman, admitted that the manufacturing industry does not consider crushing and matting to be manufacturing defects. Other testimony showed that while the direct glue-down did not cause the carpet's poor performance, it likely accelerated it. Compare *Ballenger Corp. v. Dresco Mechanical Contractors*, 156 Ga. App. 425, 433 (III) (A) (3) (274 SE2d 786) (1980) (evidence that party wilfully concealed funds and never intended to perform its obligations under subcontract authorized finding of bad faith). Lexmark's refusal to

settle Designer's claim for more than three times the amount authorized by the warranty, a demand that included incidental and consequential damages foreclosed by the warranty, does not reflect bad faith in making or entering the underlying transaction. Compare *McDonald v. Winn*, 194 Ga. App. 459, 460 (2) (390 SE2d 890) (1990) (defendants procured changes and upgrades then refused to pay the builder for them).

Notwithstanding the fact that the trial court entered a finding that the record contained evidence from which the jury could infer bad faith, Designer argues that the trial court implicitly found all three statutory grounds. But the breadth of the trial court's order cannot be expanded to say what it does not say. After Lexmark disputed the existence of any ground under OCGA § 13-6-11, the trial court denied the motion on the basis "there was evidence from which the jury could infer Lexmark's bad faith in the making or performance of the contract." At trial, in opposing the directed verdict, Designer did so on an argument relying upon only a claim of bad faith.

On appeal, Designer continues to argue that Lexmark should have notified its customers about the pad requirements in product books, on specifications sheets, or by letter and complains that the recommendation on using a pad appeared "in fine print" on an invoice sent to its business office. Designer further argues that Lexmark not only supplied defective carpet but also provided carpet weighing less than what it billed for. But, the trial court directed a verdict on the claims for fraud, fraudulent concealment, and negligence, and Designer has not appealed that decision.

In sum, the record demonstrates the existence of a bona fide controversy about the applicability and terms of Lexmark's warranty. See *Jordan Bridge Co.*, supra at 127. In completing the special verdict form, here as in *Latham*, the jury did not enter a finding that the defendant acted in bad faith. And, Designer did not object to the verdict form. "In the absence of bad faith, the award for attorney fees cannot stand." (Footnote omitted.) *Latham*, supra at 108 (2). Therefore, this award must be reversed. See *Pulte Home Corp. v. Woodland Nursery &c.*, 230 Ga. App. 455, 458 (4) (496 SE2d 546) (1998).

*Judgment reversed. Andrews, P. J., and Barnes, J., concur.*

DECIDED MAY 1, 2003 —
RECONSIDERATION DENIED JUNE 12, 2003 —

*Avrett, Ponder & Withrock, Robert M. Withrock*, for appellant.
*Richard E. Witterman, Jr.*, for appellee.