[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 7, 2008
THOMAS K. KAHN
CLERK

No. 07-10651

D. C. Docket No. 06-00038-CV-WTM-1

WILLIAM LAMBERT, SR.,

Plaintiff-Appellee,

versus

AUSTIN IND.,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Georgia

**(October 7, 2008)**

Before TJOFLAT, HULL and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, an individual has sued his former employer for alleged age and race discrimination, as well as retaliatory termination. The question before us is whether the claims he has brought should be resolved through the company's arbitration policy or in the federal courts.[1] In addressing this issue, we need only apply basic contract interpretation principles in harmony with a general federal policy in favor of arbitration. In so doing, we hold that the district court erred in denying the employer's motion to compel arbitration. The employer's arbitration policy is a valid and enforceable contract under Georgia state law, and the claims the individual presents are precisely of the type that he agreed to arbitrate through the company's arbitration policy.

I.

On June 1, 1996, Austin Maintenance & Construction, Inc. ("Austin"), a general contractor that provides construction, maintenance, and other plant services to petrochemical and refining facilities in the Southeast region of the United States, adopted "Open Door," a company-wide workplace dispute-resolution program. The Open Door program envisioned and established an

---

[1] This appeal is from a district court order denying a motion to stay proceedings and compel arbitration. We have jurisdiction to entertain the appeal under 9 U.S.C. § 16(a). Paladino v. Avnet Computer Tech. Inc., 134 F.3d 1054, 1056 (11th Cir. 1998). We review the district court's order de novo. Id.; see also Kidd v. Equitable Life Assur. Soc'y of Am., 32 F.3d 516, 518 (11th Cir. 1994).

escalating three-tiered process for resolving workplace disputes—a conference with a supervisor higher up the chain of command, followed by mediation, and, as a last resort, arbitration.

While the policy suggests that most disputes can be resolved through formal discussions with supervisors, the policy advises that should employees not be able to resolve their disputes through discussions with supervisors at the first stage, the employee may contact an "Open Door facilitator" who will provide the employee with guidance. This facilitator may assist the employee in setting up a mediation, and "in some disputes involving legal issues, such as sexual harassment or discrimination based on age, sex or race, the facilitator may assist [the employee] in setting up an arbitration." As the district court aptly noted, "[t]hese provisions of the Open Door policy indicate that Austin desired to open up communications between its employees and their supervisors when a workplace dispute arose."

Austin requires that new employees agree to and abide by the Open Door policy as a condition of employment. In particular, Austin's Application for Employment specifically requires that newly-hired employees agree "to be bound by and accept as a condition of employment the terms of Open Door." Moreover, at orientation, Austin provides newly hired employees with a pamphlet that specifically states that employees "agree to waive [their] right to a trial in a court

3

of law, and [] agree instead to resolve all legal claims against Austin through Open Door." Additionally, this pamphlet states that Austin also "waives its right to trial in a court of law and agrees to resolve such disputes through Open Door."

On November 28, 2001, William Lambert, Sr. submitted an Application for Employment to Austin. Some time later, Austin hired him as an at-will employee. During the orientation that Austin provided to new employees, Lambert received a "tri-fold Open Door pamphlet," which informed him, as he acknowledged, of the company's Open Door policy. This pamphlet described the Open Door policy and explained that all individuals who accept employment with Austin agree to abide by the Open Door workplace dispute resolution framework.

On February 28, 2005, Austin terminated Lambert's employment because, according to Austin, Lambert threatened a supervisor during a meeting five days earlier. Conversely, Lambert claims that he was terminated because of race and age, and in retaliation for his prior complaints of race discrimination.

On March 15, 2006, Lambert brought this action against Austin and its employee, James Ballew (a project director), in the United States District Court for the Southern District of Georgia. In addition to Austin and Ballew, Lambert named Prayon, Inc., and its employee, Michael Gubosh (a maintenance manager),

4

as defendants.[2]  Lambert's complaint asserted claims of race and age discrimination, as well as retaliatory termination in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq.  Austin and Ballew moved the district court to stay proceedings and compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., based upon the Open Door policy.  They moved the court, alternatively, to dismiss Lambert's complaint for failure to state a claim for relief.[3]  Prayon and Gubosh answered the complaint and then moved the court for a judgment on the pleadings.[4]

On January 29, 2007, the district court dismissed Lambert's claims against Ballew, Prayon, and Gubosh.  With respect to Austin, the court denied its motion to compel arbitration, concluding that "the claims of retaliatory and discriminatory discharge brought by [Lambert] are not the type of ongoing, workplace disputes amenable to 'open door' resolution as contemplated by the Open Door policy."  The court held, moreover, that even if the parties intended to resolve workplace claims such as Lambert's through the Open Door program, the actual details of the

---

[2]  Austin provided Prayon with maintenance labor and services pursuant to a contract with Prayon.

[3]  See Fed. R. Civ. P. 12(b)(6).

[4]  See Fed. R. Civ. P. 12(c).

5

policy were illusory and, therefore, inoperative. The court reached this conclusion by interpreting the policy as allowing Austin the unbridled discretion to grant arbitration to employees. This apparent lack of mutuality, in the court's view, rendered the program a nullity.

Austin now appeals the district court's denial of its motion to compel arbitration. For reasons articulated below, we reverse the court's order, concluding that the Open Door policy constituted a valid, enforceable agreement between Austin and its employees. We hold, moreover, that despite the fact that Lambert is no longer employed by Austin, the Open Door policy was designed to cover the particular type of workplace dispute Lambert's law suit presents.

II.

The "validity of an arbitration agreement is generally governed by the Federal Arbitration Act." Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1367 (11th Cir. 2005). Under the FAA, a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, the FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration upon a showing that (a) the plaintiff entered into a written arbitration agreement that is enforceable "under ordinary state-law" contract principles and (b) the claims before the court

fall within the scope of that agreement. See 9 U.S.C. §§ 2-4; see also Paladino, 134 F.3d at 1061. Therefore, in determining Austin's motion to compel arbitration, we must determine whether Austin's Open Door policy is an enforceable contract under Georgia law and, if so, whether Lambert's claims fall within its scope. We address each issue in turn.

A.

Under Georgia law, a contract is enforceable if there is (a) a definite offer and (b) complete acceptance (c) for consideration. See Caley, 428 F.3d at 1373. Here, neither party disputes that Austin made an offer to Lambert: namely, that both Austin and Lambert (like Austin's other employees) would arbitrate all workplace disputes.[5] Moreover, neither party disputes that Lambert accepted this offer by working at Austin.[6] Rather, the parties disagree over whether Austin provided adequate consideration to make this contract legally enforceable. In particular, Lambert contends that since Austin effectively had the power to

_____

[5] The district court properly held that this offer was provided to Lambert in writing, as required by the FAA (9 U.S.C. § 2) when Lambert received a copy of Austin's Open Door policy at orientation. The Open Door policy pamphlet explicitly provided that acceptance of the Open Door Policy is a condition to acceptance of employment with Austin.

[6] By accepting employment and performing his duties, Lambert accepted the terms of employment. See e.g., Moreno v. Strickland, 567 S.E.2d 90, 92 (2002) ("[a]n offer may be accepted ... either by a promise to do the thing contemplated therein, or by the actual doing of the thing.") (internal citations omitted).

7

determine whether employees could arbitrate their disputes, Austin offered an illusory promise which made the agreement to arbitrate invalid and unenforceable.

To satisfy the consideration requirement under Georgia law, an accepting party to a contract can either tender bargained-for performance or make a mutual promise. O.C.G.A. § 13-3-42; see also Franklin v. UAP/GA. AG. CHEM, Inc., 514 S.E. 2d 241 (Ga. App. 1999). Thus, "mutual promises and obligations of the parties constitute[] sufficient consideration for the contract." Atlanta Six Flags P'ship v. Hughes, 381 S.E.2d 605, 607 (Ga. App. 1989). However, where a party offers an illusory promise, a court will find inadequate consideration and deem the contract unenforceable. An illusory promise exists when "words of promise . . . by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue." Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc., 450 S.E.2d 427, 431 (Ga. App. 1994).

Here, Lambert argues that Austin offered an illusory promise with respect to the initiation of arbitration proceedings. In this regard, Lambert suggests that Austin's Open Door policy allows the company to determine not only when, but also if, an employee can arbitrate his workplace disputes. In pursuing this argument, Lambert relies on the following section of the Open Door policy:

8

If your dispute involves a legally protected right, such as sexual harassment or discrimination based on age, sex, or race, and you have not been able to resolve the dispute through discussions with supervisors in your chain of command or through meditation, you may request arbitration. All arbitrations under Open Door are conducted by members of the American Arbitration Association (AAA).

You should consult your Open Door facilitator to determine if your workplace dispute is appropriate for presentation to an arbitrator. If so, the facilitator will contact the AAA to initiate the process.

Relying on the last two sentences, Lambert argues that Austin's agreement to arbitrate workplace disputes is illusory because it effectively allows Austin unilaterally to opt out of arbitration. The district court agreed and held that "Austin was not required to grant arbitration to [Lambert] had he requested it. Austin's discretion in this respect shows a lack of mutuality in the alleged contract to arbitrate which nullifies the agreement." Both Lambert and the district court see the facilitator as a gatekeeper, with the ultimate authority to either allow or

deny arbitration. If this view of the facilitator as a gatekeeper is correct, then Austin's purported agreement to arbitrate claims is unenforceable for want of mutuality. If, though, the facilitator serves as a mentor/advisor rather than as a gatekeeper, then the agreement is not illusory.

A review of the text of the Open Door provisions leads us to conclude that both Lambert and the district court misconstrued the Open Door policy and the role of the facilitator. The language regarding the facilitator's role does not suggest that the facilitator is Austin's arbitration gatekeeper. Indeed, nowhere in the Open Door policy does Austin suggest that employees cannot initiate the arbitration process on their own. Instead, the text of the Open Door policy explicitly says otherwise—when employees cannot resolve their workplace disputes through conferences and mediation sessions, the Open Door policy expressly provides that employees "may request arbitration." Employees need not involve a facilitator if they wish to proceed without one.

Moreover, the language suggesting that employees "should" consult with a facilitator is phrased using permissive, rather than mandatory, language. The word "should" means "usually no more than an obligation of propriety or expediency, or a moral obligation.... [I]t does not ordinarily express certainty as 'will' sometimes does." Black's Law Dictionary 1379 (6th ed. 1990). Indeed, courts from other

10

jurisdictions have specifically held that the word "should" is permissive, and not mandatory. See e.g., U.S. v. Messino, 382 F.3d 704, 711 (7th Cir. 2004) (finding that a change of jury instructions from "may find" to "should find" had no effect because "[e]ither wording is permissive, not mandatory. 'Should' may be stronger than 'may' but the difference, in practice, is meaningless."); Atla-Medine v. Crompton Corp., 2001 WL 1382592 (S.D.N.Y. 2001) (finding that a statement that parties "should negotiate the terms and conditions" was not a promise because "'should' is permissive, not mandatory."). As such, the requirement that employees "should" consult with an Open Door facilitator (as opposed to an explicit requirement that employees "must" consult with an Open Door facilitator) further bolsters the claim that the facilitator does not serve as a gatekeeper in pre-screening arbitration claims.

The idea that the facilitator does not serve a gatekeeper function is even further buttressed by the description of the facilitator role. The Open Door pamphlet describes the role as such: "[t]he facilitator is experienced and trained to answer questions about Open Door and to help [employees] identify supervisors or managers at appropriate levels of the company to assist in resolving [the] dispute." Further, employees "will not need to identify [themselves] to the facilitator unless and until [they] feel comfortable doing so." Read in this context, the facilitator

11

merely serves as an advisor to distressed employees. The facilitator does not pre-screen the merits of the employee's claims—indeed, in many cases, the facilitator might not even know which employee he/she is advising.

When viewing the facilitator as an advisor rather than a gatekeeper, it is readily apparent that this arbitration agreement contains mutual promises – both Austin and its employees have committed to resolving workplace disputes through this Open Door process. As such, the contention that this agreement should not be enforceable for want of mutuality is rejected.

B.

Having found that the Open Door policy is a valid and enforceable agreement, we turn our attention to Lambert's second contention—that the agreement to arbitrate does not cover disputes arising in termination and post-termination contexts. If Lambert's view is adopted, then the district court was correct in holding that "the claims of retaliatory and discriminatory discharge brought by [Lambert] are not the type of ongoing, workplace disputes amenable to 'open door' resolution as contemplated by the Open Door policy." If the Open Door policy covers these types of employee disputes, however, the prosecution of

12

Lambert's law suit should be stayed pending arbitration.

In determining the scope of the Open Door policy, we are guided by both the Federal Arbitration Act and the actual text of the policy. As we have said before, "[t]he FAA creates a presumption in favor of arbitrability; so, parties must clearly express their intent to exclude categories of claims from their arbitration agreement." Paladino, 134 F.3d at 1057. Nonetheless, "courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." Goldberg v. Bear, Stearns & Co., 912 F.2d 1418, 1419-20 (11th Cir. 1990). Therefore, to determine the scope of the arbitration policy, we must parse the text of the agreement and ascertain whether Austin clearly expressed its intent to exclude termination-related disputes from the arbitration agreement.

The Open Door policy defines its scope in two places. First, in the "Mutual waiver and agreement" section, the pamphlet notes:

> Austin ... adopted Open Door ... as the exclusive means for resolving all workplace disputes including legally protected rights, such as sexual harassment or discrimination based on age, sex, or race. That means if you accept or continue your employment with Austin ..., you agree to waive your right to a trial in a court of law, and you agree instead to resolve all legal claims against Austin through Open Door instead of through the court system. Austin likewise waives its rights to trial in a court of law and agrees to resolve such disputes through Open Door.

13

(emphasis added). In addition, in the final paragraph of the pamphlet, the policy notes that "Open Door establishes a mandatory program for the resolution of disputes arising from or related to employment." (emphasis added). Taken together, these statements express a broad, all-inclusive desire to arbitrate disputes, especially disputes based on age and race discrimination.

Nonetheless, despite this encompassing language, Lambert suggests that termination disputes do not fall within the ambit of the arbitration provisions because (a) the arbitration policy mentions only "employee-owners" and makes no mention of former employees; (b) the policy makes no mention of claims arising out of a termination; and (c) termination issues are not workplace disputes in the sense that terminated employees have no supervisor or chain of command. We address these points in turn.

The first two can easily be dismissed out of hand: that the arbitration agreement uses general, rather than specific, language does not mean that the arbitration agreement is limited in scope to only a narrowly defined subset of claims. Indeed, as we have said before, "[a] party cannot avoid arbitration . . . because the arbitration clause uses general, inclusive language, rather than listing every possible specific claim. . . . An arbitration agreement is not vague solely

14

because it includes the universe of the parties' potential claims against each other." <u>Brown v. ITT Consumer Financial Corp.</u>, 211 F.3d 1217, 1221 (11th Cir. 2000).[7]  Thus, the fact that the Open Door policy does not explicitly mention former employees or termination proceedings is no bar to finding that the claims alleged by Lambert are encompassed under the Open Door policy.

Lambert's third point, that his retaliatory termination claim cannot fall under the scope of the Open Door policy because he has no supervisor to consult with, deserves more attention.  Lambert essentially makes two arguments in support of this point.  First, he argues that the language "all workplace disputes" and "disputes arising from or related to employment" does not cover termination disputes, since termination disputes occur post-employment.  Second, he suggests that, to the extent the language is ambiguous, the language should be interpreted to not include termination disputes since the Open Door policy was intended to resolve disputes through discussions with supervisors and others up the chain of command.  Since terminated employees no longer have a direct supervisor, he urges us to find that termination disputes are outside the purview of the arbitration

---

[7] Lambert contends that <u>Brown</u> is inapposite, because the arbitration policy language in that case covered "any dispute" between the parties, whereas the language in this agreement purports to cover "all workplace disputes."  For the reasons that follow, we find that termination proceedings are fairly encompassed within the meaning of "all workplace disputes."

15

agreement.

A plain meaning interpretation of either the "all workplace disputes" or "disputes arising from or related to employment" language suggests that employment-termination disputes do indeed fall under the scope of the Open Door arbitration agreement. It is axiomatic that a termination from a job "arises from or relates" to employment at a company. Similarly, a termination is a "workplace dispute" in the sense that termination is the final stage of a workplace dispute – that is, employers resort to termination as a last step in resolving workplace conflicts. Thus, because termination proceedings are the final incident of a workplace conflict, Lambert's suggestion that this dispute falls outside the scope of the arbitration agreement is rejected.

Our conclusion is further supported by the federal policy favoring arbitration. As we have noted previously, "[t]he FAA creates a presumption in favor of arbitrability; so, parties must clearly express their intent to exclude categories of claims from their arbitration agreement." Paladino, 134 F.3d at 1057. Reaching the conclusion that termination disputes are clearly excluded from the scope of the arbitration agreement would require us to contort and displace the language of the arbitration agreement.

In addition to the textual argument, Lambert contends that Open Door

cannot be used to resolve conflicts involving former employees since former employees no longer have a supervisor or other representative higher up the chain of command. While it is true that former employees no longer have a work supervisor, it is incorrect to assume that the absence of a supervisor means that aggrieved former employees can skirt the arbitration process and sue their former employer in a court. Rather, Austin's Open Door policy makes clear that former employees may still request meditation and arbitration with their <u>former</u> supervisors. Indeed, support for the idea that former employees can use Open Door is found in at least two places. First, in the "On-the-job injuries" section, the Open Door policy notes that "claims of wrongful discharge related to worker's compensation claims will be covered by Open Door." This section accordingly suggests that Open Door envisions that former employees who believe that they were wrongfully discharged will still use the Open Door conflict resolution system to resolve their disputes. Second, in the "Retaliation prohibited" section, the policy provides that employees who feel retaliated against by their supervisors for using the Open Door system, should "talk with the next higher level in [their] chain of command, or with the Open Door facilitator, or with [their] personnel department." Thus, even when employees (terminated or not) feel foreclosed from speaking with their supervisors, Open Door provides mechanisms for dispute

17

resolution.  Lambert's contention that this dispute falls outside the purview of Open Door because Lambert no longer has a formal supervisor is therefore rejected, since Lambert could still arbitrate his dispute with his former supervisor, others up the chain of command, or individuals in the personnel department.

## III.

Finding a valid, enforceable arbitration agreement, we are unpersuaded that Lambert's age and racial discrimination dispute, as well the alleged retaliatory termination, falls outside the purview of the Open Door dispute resolution policy. As such, resolution of Lambert's dispute is best left to Austin's arbitration policy. The district court's order denying Austin's motion to compel arbitration is accordingly reversed.

REVERSED.