MARK H. COHEN, United States District Judge
This case comes before the Court on Defendant AMEC Foster Wheeler Programs, Inc.'s ("AMEC") Motion to Dismiss [Doc. 7]. For the reasons explained below, AMEC's motion is DENIED.
I. BACKGROUND
In June 2015, the United States Army Corps of Engineers issued a solicitation for a construction project in Poland (the "Project"). Compl. ¶ 6. Hoping to put together a proposal for the Project, AMEC asked subcontractors Crystal Steel Fabricators, Inc. and Memco, Inc. (collectively, "Plaintiffs") to submit proposals for supplying and erecting the Project's structural steel *1367 work. Id. ¶¶ 7-9. Plaintiffs agreed, and in September 2015, the parties entered into a contract-titled the "Teaming Agreement"-concerning the joint preparation and submission of a proposal for the Project. Id. ¶¶ 9-11; see Teaming Agreement, attached as Ex. A to Compl. [Doc. 1-1] ("Teaming Agreement").
According to the terms of the Teaming Agreement, Plaintiffs promised (1) to support AMEC's proposal for the structural steel work described in its statement of work, (2) to support only AMEC in its efforts to submit a successful proposal, and (3) to give up their rights to support other bidders for the Project as well as their rights to independently bid for the Project. Compl. ¶ 12; Teaming Agreement § I.C, II. In exchange, AMEC promised that, if awarded a contract, it would use its best efforts to negotiate in good faith with Plaintiffs to enter a subcontract for the Project's structural steel work. Compl. ¶ 12; Teaming Agreement § I.D, IV. In relevant part, the Teaming Agreement provided:
[§ I.A] Prime Contractor [AMEC] shall submit, as prime contractor, a proposal for the project. Subcontractor shall support the proposal for the types of work identified in the Subcontractor Statement of Work attached hereto as Exhibit 1 ("Exhibit 1" or "SOW") ...
[§ I.C] Subcontractor agrees that it is entering into this agreement on an exclusive basis. Subcontractor shall not furnish support to any other party competing as a prime contractor nor compete independently for work under the project.
[§ II] Subcontractor will furnish for incorporation into Prime Contractor's proposal all appropriate materials pertinent to the work assigned to Subcontractor described in Exhibit 1 ...
[§ I.D] In the event Prime Contractor is successful in its proposal for obtaining the contract for the Project ("Prime Contract"), the parties shall ... use their best efforts and negotiate in good faith to enter into a subcontract under which Subcontractor agrees to perform the types of work described in Exhibit 1 ...
Plaintiffs allege that, although they fully performed their duties under the Teaming Agreement-and although AMEC relied on their proposal in successfully obtaining a contract for the Project-AMEC subsequently "failed to use any efforts" to negotiate in good faith with Plaintiffs to enter into a subcontract for the structural steel work and instead entered into a contract with another subcontractor. Compl. ¶¶ 14-20. Plaintiffs further allege that they incurred direct and indirect expenses and costs of at least $150,000.00 "in preparing and submitting to AMEC all appropriate materials, including price proposals, pertinent to the work assigned to 'Subcontractor' described in the Statement of Work." Id. ¶¶ 21, 56.
Plaintiffs now bring claims against AMEC for breach of contract (Count One), promissory estoppel (Count Two), unjust enrichment (Count Three), and quantum meruit (Count Four).
II. LEGAL STANDARD
Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(b)(6), a claim will be dismissed for failure to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has explained this standard as follows:
*1368 A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.
Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal citation omitted). Thus, a claim will survive a motion to dismiss only if the factual allegations in the pleading are "enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555, 127 S.Ct. 1955.
At the motion to dismiss stage, the court accepts all the well-pleaded facts in the plaintiff's complaint as true, as well as all reasonable inferences drawn from those facts. McGinley v. Houston, 361 F.3d 1328, 1330 (11th Cir. 2004) ; Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002). Not only must the court accept the well-pleaded allegations as true, they must be construed in the light most favorable to the pleader. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011). But the court need not accept legal conclusions, nor must it accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Thus, evaluation of a motion to dismiss requires the court to assume the veracity of well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S.Ct. 1937. "A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc., 522 F.3d 1190, 1194 (11th Cir. 2008) (internal quotations and citation omitted).
III. DISCUSSION
A. Plaintiffs State a Cognizable Claim for Breach of Contract Based on AMEC's Alleged Breach of the Teaming Agreement
1. Whether Georgia Law Would Recognize a "Contract to Negotiate"
As explained above, pursuant to the Teaming Agreement, Plaintiffs promised (1) to support AMEC's proposal for the structural steel work described in its statement of work, (2) to support only AMEC in its efforts to submit a successful proposal, and (3) to give up their rights to support other bidders for the Project as well as their rights to independently bid for the Project. Compl. ¶ 12; Teaming Agreement §§ I.C, II. In exchange, AMEC promised that, if awarded a contract for the Project, it would use its best efforts to negotiate in good faith with Plaintiffs over the subcontract for structural steel work on the Project. Teaming Agreement § I.D. However, AMEC now argues that, "by [its] very terms," the Teaming Agreement is an unenforceable "agreement to agree" that fails to include the essential elements of a contract under Georgia law. See Def.'s Mem. of Law in Supp. of its Mot. to Dismiss [Doc. 7-1] ("Def.'s Mem.") at 5.
The essential elements of a contract under Georgia law are: (1) parties able to contract; (2) consideration; (3) a subject matter upon which the contract can operate; and (4) the assent of the parties to the terms of the contract. O.C.G.A. § 13-3-1 ; TranSouth Fin. Corp. v. Rooks, 269 Ga. App. 321, 323, 604 S.E.2d 562 (2004). Generally, a so-called "agreement to agree" is unenforceable in Georgia where the parties have not assented to the "essential" terms of the contract. See *1369 Kreimer v. Kreimer, 274 Ga. 359 363, 552 S.E.2d 826 (2001) ("If a contract fails to establish an essential term, and leaves the setting of that term to be agreed upon later by the parties to the contract, the contract is deemed an unenforceable 'agreement to agree.' ") (footnote and citation omitted). However, no Georgia court has directly addressed the issue of whether so-called "contracts to negotiate"[1] make up a distinct category of enforceable contracts distinguishable from agreements to agree.[2] See St. Joseph Hosp., Augusta, Georgia, Inc. v. Health Mgmt. Assocs., Inc., No. CV 107-104, 2011 WL 1225577, at *14 (S.D. Ga. Mar. 30, 2011), aff'd, 705 F.3d 1289 (11th Cir. 2013) (recognizing *1370 that it is "unclear whether Georgia courts would allow an independent claim based on an alleged breach of a letter of intent's promise to cooperate or whether this promise would be considered a part of the unenforceable agreement to agree[.] )." As a federal court sitting in diversity, this court must apply the law as declared by Georgia's highest court. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, in light of Georgia law's silence on the question of whether a contract to negotiate may be a binding contract, the Court must "determine the issues of state law as [it] believes the Georgia Supreme Court world." CSX Transp., Inc. v. Trism Specialized Carriers, Inc., 182 F.3d 788, 790 (11th Cir. 1999).
The modern trend among courts has been to carve out an exception to the rule against enforcing "agreements to agree" for so-called "contracts to negotiate" like the Teaming Agreement. Although the Eleventh Circuit has yet to address the issue, "[m]any more jurisdictions have recognized the enforceability of contracts to negotiate than have repudiated that doctrine .... [and] the trend line appears to be moving steadily in favor of recognizing a cause of action for breach of a contract to negotiate." Butler, 736 F.3d at 614 (collecting multiple cases and sources of authority); see also Brown v. Cara, 420 F.3d 148, 157-58 (2d Cir. 2005) (recognizing the enforceability of contracts to negotiate under New York law); Keystone Land & Dev. Co. v. Xerox Corp., 353 F.3d 1093, 1097 (9th Cir. 2003) (noting the "modern trend in contract law" towards recognizing contracts to negotiate, and observing that "[m]ost jurisdictions recognize the enforceability of contracts to negotiate in an appropriate case."); ATACS Corp. v. Trans World Commc'ns, Inc., 155 F.3d 659, 668 (3d Cir. 1998) (recognizing the enforceability of a teaming agreement similar to the one here under Pennsylvania law); Alan Schwartz & Robert E. Scott, Precontractual Liability and Preliminary Agreements, 120 Harv. L. Rev. 661, 675 & n.7 (2007) (characterizing the recognition of contracts to negotiate as the "new default rule," and recognizing that at least thirteen states, sixteen federal district courts, and seven federal circuits now follow this approach).
In doing so, courts have distinguished between "three different but similar types of agreements:" (1) traditional "agreements to agree"-that is, agreements "to do something which requires a further meeting of the minds of the parties and without which it would not be complete;" (2) "agreements with open terms," pursuant to which "the parties intend to be bound by the key points agreed upon with the remaining terms supplied by a court or another authoritative source;" and (3) contracts to negotiate, pursuant to which "the parties exchange promises to conform to a specific course of conduct during negotiations, such as negotiating in good faith, exclusively with each other, or for a specific period of time." Keystone Land & Dev. Co. v. Xerox Corp., 152 Wash.2d 171, 94 P.3d 945, 948 (Wash. 2004) (internal citation and quotation omitted); see also Butler, 736 F.3d at 613. "In contrast to an agreement to agree, under a contract to negotiate, no breach occurs if the parties fail to reach agreement on the substantive deal. The contract to negotiate is breached only when one party fails to conform to the specific course of conduct agreed upon." Keystone, 94 P.3d at 948.
In light of this trend, there is ample support for enforcing contracts to negotiate-authority that the Georgia Supreme Court would likely find persuasive. See Butler, 736 F.3d at 614 ("There is ... abundant support for the enforcement of contracts to negotiate in other sources that the Washington Supreme Court would be apt to find persuasive."). As the First Circuit observed in Butler, a contract to negotiate "presents no obvious exception" to *1371 the baseline rule that a contract is merely a legally-enforceable exchange of promises formed when (1) the parties objectively manifest their intention to be bound and (2) consideration exists. Id. at 614 (citing Restatement (Second) of Contracts §§ 1, 17 (1981) ). The Court also notes that Georgia law recognizes that "a deferral of agreement on a nonessential term does not invalidate an otherwise valid contract." Goobich v. Waters, 283 Ga. App. 53, 56, 640 S.E.2d 606 (2006) (citing Kreimer, 274 Ga. at 363, 552 S.E.2d 826 ). At least one other court has recognized that, in the context of an agreement to negotiate, the object of the parties' agreement (i.e., the thing to be negotiated in the future) is a "nonessential element" of that contract. Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 408-09 (4th Cir. 2002) (concluding that the parties' agreement to negotiate "towards a mutually acceptable asset purchase agreement" was an enforceable agreement "to negotiate in good faith towards filling in the [nonessential] open terms[.]"); see also Bommer v. Reynolds, 465 F. App'x 876, 879-80 (11th Cir. 2012) ("[A]s we understand the law, the parties to a contract can agree to bind themselves by that contract to negotiate in good faith and to work out-within an agreed framework-some terms that remain open.").
Furthermore, both scholarly works and case law have offered "compelling reasons both as to why parties may desire to exchange such binding promises and as to why courts may deem it socially beneficial to enforce them"-chief among them the fact that "modern transactions often involve significant up-front investments in deal structuring and due diligence" that "parties may wish to protect" so as to forestall one party from "tak[ing] advantage of the other party's sunk investment by trying to retool the deal at the last minute." Butler, 736 F.3d at 615 ; see generally Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F.Supp. 491, 499 (S.D.N.Y. 1987) ("Giving legal recognition to preliminary binding commitments serves a valuable function in the marketplace .... [w]ithout such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement[.]"). In honoring contracts to negotiate, courts recognize that "parties may wish to build in safeguards that will operate early in the bargaining process ... by binding themselves sufficiently such that they feel comfortable investing resources into the deal, but without inextricably committing themselves to a transaction that is still inchoate." Butler, 736 F.3d at 615. As the Seventh Circuit has explained:
The process of negotiating multimillion dollar transactions, like the performance of a complex commercial contract, often is costly and time-consuming. The parties may want assurance that their investments in time and money and effort will not be wiped out by the other party's footdragging or change of heart or taking advantage of a vulnerable position created by the negotiation. Suppose the prospective buyer spends $100,000 on research, planning, and consultants during the negotiation, money that will have bought nothing of value if the negotiation falls through, while the seller has spent nothing and at the end of the negotiation demands an extra $50,000, threatening to cancel the deal unless the buyer consents. This would be an extortionate demand, and, as it is profoundly unclear whether it would be independently tortious, parties to a negotiation would want a contractual remedy. But they might prefer to create one in the form of a deposit or drop fee (what in publishing is called a "kill fee"), rather than rely on a vague duty to bargain in good faith. That is one reason why the notion of a legally enforceable duty to *1372 negotiate in good faith toward the formation of a contract rests on somewhat shaky foundations, though some contracts do create such a duty, which shows that some business people want it.
Venture Assocs. Corp. v. Zenith Data Sys. Corp., 96 F.3d 275, 278 (7th Cir. 1996) (internal citations omitted). The allegations in Plaintiffs' Complaint illustrate this point. As explained above, Plaintiffs allege that they incurred direct and indirect expenses and costs of at least $150,000.00 "in preparing and submitting to AMEC all appropriate materials, including price proposals, pertinent to the work assigned to 'Subcontractor' described in the Statement of Work." Compl. ¶ 21. Accepting the allegations in the Complaint as true, the present case appears to have involved the kind of upfront investment of time and resources that might lead parties to enter into a contract to negotiate.
The Court recognizes that there are several objections to enforcing contracts to negotiate-in particular, that (1) courts will struggle to define just what a duty to "negotiate in good faith" really means; (2) damages will be hard to measure where a party breaches that duty; and (3) courts may find themselves enforcing agreements that the parties never actually intended to be binding. See Butler, 736 F.3d at 615-16. In Butler, however, the First Circuit addressed each of these concerns, finding none of the three compelling enough to require a different result:
[C]ourts are understandably hesitant to enforce agreements whose terms are too indefinite to allow easy and objective identification of a breach. See Restatement (Second) of Contracts § 33 (1981) ; see also Keystone, 94 P.3d at 949. With respect to contracts to negotiate, it can be argued that courts will struggle both to define "negotiating in good faith" and to identify a party's failure to do so. See 1 Arthur L. Corbin, Corbin on Contracts § 2.9 (Joseph M. Perillo rev. ed. 1993). But in the main, courts have found this obstacle surmountable. See, e.g., Teachers Ins., 670 F.Supp. at 506 ; Logan v. D.W. Sivers Co., 343 Or. 339, 169 P.3d 1255, 1259-60 (2007) ; see also A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Grp., Inc., 873 F.2d 155, 158-60 (7th Cir. 1989) (finding no breach of obligation to negotiate in good faith).
Moreover, courts routinely make judgments as to parties' good faith (or the lack of it) in analogous contexts. See, e.g., O'Tool v. Genmar Holdings, Inc., 387 F.3d 1188, 1197-1203 (10th Cir. 2004) (discussing implied duty of good faith and fair dealing under Delaware law); Mathis v. Exxon Corp., 302 F.3d 448, 453-59 (5th Cir. 2002) (discussing Uniform Commercial Code duty to act in good faith when fixing open price terms); Peckham v. Cont'l Cas. Ins. Co., 895 F.2d 830, 834-35 (1st Cir. 1990) (discussing insurer's duty to negotiate settlements in good faith). And with specific reference to contracts to negotiate, Professor Farnsworth has suggested that bad faith in negotiations can be separated into seven subsets: "refusal to negotiate, improper tactics, unreasonable proposals, nondisclosure, negotiation with others, reneging, and breaking off negotiations." 1 Farnsworth on Contracts, § 3.26c (3d ed. 2004); see also E. Allan Farnsworth, Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Colum. L. Rev. 217, 269-85 (1987). This refinement makes the definitional task easier.
Second, courts and scholars have quibbled about the appropriate measure of damages when a contract to negotiate has been breached. In the opinion of some, damages should be limited to the sums spent in reliance on the broken promise. See, e.g., Copeland v. Baskin Robbins U.S.A., 96 Cal.App.4th 1251, 117 Cal.Rptr.2d 875, 885 (2002) ;
*1373 Logan, 169 P.3d at 1263. In the opinion of others, expectancy damages may be available. See, e.g., Venture Assocs. 96 F.3d at 278-79 ; Columbia Park Golf Course, Inc. v. City of Kennewick, 160 Wash.App. 66, 248 P.3d 1067, 1076-78 (2011). This uncertainty, however, does not speak to the viability of a cause of action for breach of a contract to negotiate. It speaks only to the nature of the proper remedy.
Third, some judges have worried about the manifest need for courts charged with enforcing contracts to negotiate to tread carefully lest they "trap [ ] parties in surprise contractual obligations that they never intended." Teachers, 670 F.Supp. at 497. But this concern was noted and discounted in Keystone, where the Washington Supreme Court concluded that the state's fundamental requirements for contract formation were sufficient to address it. Keystone, 94 P.3d at 949.[3]
Butler, 736 F.3d at 615-16.
Finally, although AMEC argues in the alternative that the Teaming Agreement consists of nothing more than an unenforceable "illusory promise"-that is, a promise whose terms "make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue," Lambert v. Austin Ind., 544 F.3d 1192, 1196 (11th Cir. 2008) (quoting Kemira, Inc. v. Williams Investigative & Sec. Servs., Inc., 215 Ga. App. 194, 198, 450 S.E.2d 427 (1994) )-this claim misses the conceptual mark: though AMEC correctly points out that the Teaming Agreement did not include a guarantee of work to Plaintiffs, it ignores the fact that the Teaming Agreement did include a guarantee to negotiate in good faith. Id. at 5-6. In other words, the Teaming Agreement makes plain that AMEC's contemplated performance-i.e., its agreement to negotiate in good faith-was certainly not "entirely optional."[4]
For all of the foregoing reasons, the Court concludes that the Georgia Supreme Court would most likely recognize the enforceability of a contract to negotiate.[5]
*1374 2. Whether Plaintiffs Have Sufficiently Pled the Existence of a Contract
Having found that the Georgia Supreme Court would most likely recognize the enforceability of a contract to negotiate, the Court must now determine whether Plaintiffs have sufficiently pled that such a contract exists here. In conducting this inquiry, courts have generally looked to the Southern District of New York's opinion in Teachers, which devised a five-part test for determining whether the parties to an alleged contract to negotiate (or what Teachers referred to as a "preliminary commitment," see n.1, supra ) intended for it to be binding. See Teachers, 670 F.Supp. at 499-503. Those factors are:
(1) whether the intent to be bound is revealed by the language of the agreement;
(2) the context of the negotiations;
(3) the existence of open terms;
(4) partial performance; and
(5) the custom of such transactions.
Id.; see, e.g., Brown, 420 F.3d at 157 (identifying and applying these five factors); Burbach, 278 F.3d at 408 (same).
Taking the allegations in the Complaint as true, Plaintiffs have sufficiently alleged that the Teaming Agreement was an enforceable contract to negotiate. In addition to the mutual promises discussed above (which are expressly memorialized as such in the contract),[6] the Teaming Agreement *1375 includes multiple indicia of a traditional contract, including a termination provision (see Teaming Agreement § VI), an assignment provision barring assignment without consent (id. §§ VI and VII), an integration provision (id. § XIV(A) ), a choice-of-law provision (id. § XIV(D) ), a dispute resolution provision (id. ), a waiver provision (specifying that "the failure of either party to enforce ... any provisions of this Agreement... shall in no way be construed as a waiver," id. § XIV(E) ), a provision excusing the parties from certain defaults (id. § XIV(G) ), and two non-disclosure agreements (see id. at 15-27). Furthermore, as explained above, Plaintiffs allege that they partially performed the contract by investing approximately $150,000.00 "in preparing and submitting to AMEC all appropriate materials, including price proposals, pertinent to the work assigned to 'Subcontractor' described in the Statement of Work," Compl. ¶¶ 21, 56, in the expectation that AMEC would honor its agreement to negotiate in good faith were it awarded a contract for the Project.
The Court concludes that Plaintiffs have sufficiently pled that these provisions, taken together with the contract as a whole as well as the parties' alleged conduct in negotiating it, evince the parties' intention to be bound by the Teaming Agreement. See Teachers, 670 F.Supp. at 499 ("In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is ... to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached."). Other courts have found substantially similar contracts to negotiate to be binding. See, e.g., Butler, 736 F.3d at 611 (finding the plaintiff sufficiently plead a claim for breach of contract where the parties had memorialized their "mutual intention to negotiate and enter into a separate Purchase Agreement" by a specified date, and further (1) that they would "use their best efforts to negotiate and attempt to agree to terms for the Purchase Agreement" and (2) that the plaintiff would "refrain from negotiating with any other prospective purchasers before the signing deadline."); ATACS Corp., 155 F.3d at 668 (concluding that the parties' teaming agreement was a valid and enforceable contract where the plaintiffs promised to assist with defendant's bid for a project, introduce defendant to plaintiffs' agent, and work exclusively with the defendant "in return for good faith and exclusive negotiations with plaintiffs toward executing a subcontract.").
For the foregoing reasons, the Court concludes that Plaintiffs have sufficiently alleged that the parties' Teaming Agreement is a legally enforceable contract under Georgia law. Accordingly, AMEC's Motion to Dismiss is DENIED with respect to Count One of the Complaint.
B. Plaintiffs State Claims for Promissory Estoppel, Unjust Enrichment, and Quantum Meruit
Next, AMEC argues that Counts Two, Three, and Four of the Complaint fail to state claims for promissory estoppel, unjust enrichment, or quantum meruit, respectively.
*1376 1. Promissory Estoppel (Count Two)
To state a claim for promissory estoppel under Georgia law, a plaintiff must allege: (1) that the defendant made a promise; (2) that the defendant should have reasonably expected the plaintiff to rely on that promise; (3) the defendant did rely on the promise to his detriment; and (4) injustice can only be avoided only by the enforcement of the promise. O.C.G.A. § 13-3-44(a) ; see, e.g., Kamat v. Allatoona Fed. Sav. Bank, 231 Ga. App. 259, 263, 498 S.E.2d 152 (1998). Plaintiffs allege in the Complaint that they submitted their subcontracting proposal to AMEC in reliance on its promise that it would negotiate with them in good faith; that AMEC should have reasonably expected that Plaintiffs would rely on its promise; and that, in relying on AMEC's promise, Plaintiffs "changed their position to their detriment by surrendering and foregoing valuable rights, including the rights to submit proposals to other contractors ... [and] directly to the Government[.]" Compl. ¶¶ 29-35.
AMEC argues that Plaintiffs' claim for promissory estoppel must fail because the Teaming Agreement was nothing more than a vague promise on which it was unreasonable for Plaintiffs to rely. See Defs.' Mem. at 8-9. But as explained above, Plaintiffs have sufficiently alleged that the Teaming Agreement was a legally enforceable contract pursuant to which Plaintiffs promised (1) to support AMEC's proposal for the structural steel work described in its statement of work, (2) to support only AMEC in its efforts to submit a successful proposal, and (3) to give up their rights to support other bidders for the Project as well as their rights to independently bid for the Project themselves in exchange for AMEC promise that it would negotiate in good faith with Plaintiffs if awarded a contract. In light of the foregoing, the Court concludes that these allegations are also sufficient to support a claim for promissory estoppel. AMEC's Motion to Dismiss is therefore DENIED with respect to Count Two of the Complaint.
2. Unjust Enrichment (Count Three)
To state a claim for unjust enrichment in Georgia, a plaintiff must assert that (1) the defendant induced or encouraged the plaintiff to provide something of value to the defendant; (2) the plaintiff provided a benefit to the defendant with the expectation that the defendant would be responsible for the cost thereof; and (3) the defendant knew of the benefit being bestowed upon it by the plaintiff and either affirmatively chose to accept the benefit or failed to reject it. Campbell v. Ailion, 338 Ga. App. 382, 387, 790 S.E.2d 68 (2016). AMEC argues Plaintiffs' unjust enrichment claim must fail as well because it "did not induce Plaintiffs to perform and then leave them in the dust ... [t]he parties consciously entered into the Teaming Agreement fully aware of the risks." Defs.' Mem. at 12. For the same reasons discussed in Section III.A, above, this argument fails. See, e.g., Clark v. Aaron's, Inc., 914 F.Supp.2d 1301, 1309 (N.D. Ga. 2012) ("While a party, indeed, cannot recover under both a breach of contract and unjust enrichment theory, a plaintiff may plead these claims in the alternative.").
AMEC also argues that, because "the existence of [a] contract between the parties precludes [an] unjust enrichment claim," Plaintiffs cannot recover if the Court finds the Teaming Agreement legally enforceable. Def.'s Mem. at 13 (quoting Bogard v. Inter-State Assur. Co., 263 Ga. App. 767, 769, 589 S.E.2d 317 (2003) ); see also Jones v. White, 311 Ga. App. 822, 827, 717 S.E.2d 322 (2011) ("A claim of unjust enrichment will lie if there is no legal contract and the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment *1377 which the benefited party equitably ought to return or compensate for.") (internal quotations omitted). But this argument is premature: the rule AMEC cites only applies where the existence of a contract is undisputed, which is not the case here. See Clark, 914 F.Supp.2d at 1310 (permitting plaintiff's claims for both unjust enrichment and breach of contract to proceed where the defendant disputed the validity of the contracts at issue). Otherwise, Federal Rules 8(d)(2) and 8(d)(3) permit a plaintiff to allege inconsistent claims at the pleading stage of a case:
(2) Alternative Statements of a Claim or Defense. A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.
(3) Inconsistent Claims or Defenses. A party may state as many separate claims or defenses as it has, regardless of consistency.
FED. R. CIV. P. 8(d)(2)-(3) ; see, e.g., Corp. Co. of Miami v. Great Lakes Transportation Holding LLC, No. 12-80502-CIV, 2012 WL 12868722, at *6 (S.D. Fla. Dec. 19, 2012) (rejecting defendant's argument that the plaintiff's unjust enrichment and quantum meruit claims should be dismissed where plaintiff also alleged breach of an express contract, and explaining that "this argument ignores the basic tenet of alternative pleading").
AMEC's Motion to Dismiss is therefore DENIED with respect to Count Three of the Complaint.
3. Quantum Meruit (Count Four)
To state a claim for quantum meruit in Georgia, a plaintiff must allege: (1) the performance of valuable services that were (2) accepted by the receipt or at his request; (3) that the failure to compensate the provider would be unjust; and (4) that the provider expected compensation at the time the services were rendered. Amend v. 485 Props., 280 Ga. 327, 329, 627 S.E.2d 565 (2006). Plaintiffs allege in their Complaint that they are entitled to recover the approximately $150,000.00 in costs and expenses they incurred in preparing and submitting proposals to AMEC in preparation for its bid on the Project. Compl. ¶ 57.
AMEC argues that Plaintiffs' claim for quantum meruit must fail as a matter of law because, pursuant to the plain language of the Teaming Agreement, each party agreed to "perform its responsibilities in connection with the preparation and submission of the proposal for the Project at no cost to the other party." Defs.' Mem. at 11-12 (quoting Teaming Agreement § 2). Plaintiffs respond that this language is not dispositive of their claim, and argue that the Complaint sufficiently alleges (1) that "AMEC should have reasonably expected, and upon information and belief did expect, that [Plaintiffs] would look to it for payment of the costs and expenses incurred in preparing and submitting their proposals to AMEC" and (2) that Plaintiffs "expected that AMEC would pay them" for these costs. Compl. ¶¶ 55-56; Pls.' Opp'n to Mot. to Dismiss [Doc. 11] ("Pls.' Opp'n") at 24-25.
Although "[t]he construction of a contract is a question of law for the courts," Kwok v. Delta Air Lines, Inc., 994 F.Supp.2d 1290, 1293 (N.D. Ga. 2014) (quoting Avion Systems, Inc. v. Thompson, 293 Ga. App. 60, 62, 666 S.E.2d 464 (2008) ), "[c]ontract interpretation is typically inappropriate at the motion to dismiss stage." Alhassid v. Bank of Am., N.A., 60 F.Supp.3d 1302, 1312 (S.D. Fla. 2014) ; see also United States v. Pub. Warehousing Co. K.S.C., No. 1:05-CV-2968-TWT, 2017 WL 1021745, at *8 (N.D. Ga. Mar. 16, 2017) (declining to construe contractual language at motion to dismiss stage).
*1378 Plaintiffs argue that any construction of the Teaming Agreement with respect to their quantum meruit claim necessarily requires "a more in-depth evaluation of the 'true facts' and allegations" in the underlying suit. Latex Const. Co. v. Everest Nat. Ins. Co., No. 1:12-CV-0892-RWS, 2012 WL 5471831, at *3-4 (N.D. Ga. Nov. 8, 2012) (declining to construe contract at the motion to dismiss phase where the plaintiff argued that analysis of the contract required further factual development of the record). Accepting the well-pleaded allegations in the Complaint as true, the Court concludes that Plaintiffs have stated a plausible claim for quantum meruit.
Alternately, AMEC argues that Plaintiffs' quantum merit claim is precluded because "there can be no recovery in quantum meruit where an express contract governs all the claimed rights and responsibilities of the parties." Defs.' Mem. at 14 (citing Gilbert v. Edmondson, 193 Ga. App. 593, 388 S.E.2d 713 (1989) ); see also Davidson v. Maraj, 609 F. App'x 994, 999 (11th Cir. 2015). But as explained above, this rule does not apply where the existence of a contract is disputed; otherwise, Federal Rules 8(d)(2) and 8(d)(3) permit a plaintiff to allege inconsistent claims at the pleading stage of a case. See Corp. Co. of Miami, 2012 WL 12868722, at *6.
AMEC's Motion to Dismiss is therefore DENIED with respect to Count Four of the Complaint.
C. Whether Plaintiffs' Alleged Damages Fail as a Matter of Law
Finally, AMEC argues that Plaintiffs' alleged damages in Counts One and Two-pursuant to which Plaintiffs seek $2,500,000 in "direct damages," Compl. ¶¶ 24, 37-must fail as a matter of law. See Def.'s Mem. at 15-18. AMEC argues that Plaintiffs' Complaint mischaracterizes what are really lost profit damages as "direct damages," and that the Teaming Agreement's consequential damages waiver should therefore bar their recovery.[7] Def.'s Mem. at 15-17. Alternately, AMEC argues that, notwithstanding the legal effect of the damages waiver, Plaintiffs' claimed "direct damages" are effectively "anticipated profits," which are generally too "speculative and uncertain" to be recoverable under Georgia law. Def.'s Reply at 10-11 (citing EZ Green Assocs., LLC v. Ga. Pac. Corp., 331 Ga. App. 183, 187, 770 S.E.2d 273 (2015) ("It is well settled that anticipated profits are too speculative and uncertain to be recoverable.") ). Plaintiffs dispute AMEC's construction of the contract, and further argue that damages for lost profits are an appropriate legal remedy for breach of the Teaming Agreement. Pl.'s Opp'n. at 28-32.
Although AMEC maintains that it would be appropriate for the Court to construe the Teaming Agreement's damages waiver at this stage, the Court concludes that answering this question "necessarily requires the resolution of questions of fact" which are not appropriately addressed at this stage. Liberty Life Ins. Co. v. Thomas B. Hartley Const. Co., 258 Ga. 808, 809, 375 S.E.2d 222 (1989) ; see also WESI, LLC v. Compass Envtl., Inc., 509 F.Supp.2d 1353, 1360 (N.D. Ga. 2007) (concluding that, where disputed questions of fact remained, the defendants' damages theory was best addressed at summary *1379 judgment). Although AMEC correctly observes that anticipated profits are generally "too speculative and uncertain to be recoverable" in Georgia, it nevertheless acknowledges that there are "limited circumstances" in which this rule does not apply. Def.'s Reply at 10-11 (citing KAR Printing, Inc. v. Pierce, 276 Ga. App. 511, 511-12, 623 S.E.2d 704 (2005) ).
Ordinarily, anticipated profits are too speculative to be recovered, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits were in the contemplation of the parties at the time of the contract, they may be recovered even though they cannot be computed with exact mathematical certainty. Nonetheless, to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery.
KAR Printing, 276 Ga. App. at 511, 623 S.E.2d 704 (quoting Authentic Architectural Millworks, Inc. v. SCM Grp. USA, Inc., 262 Ga. App. 826, 831, 586 S.E.2d 726 (2003) ). Ultimately, AMEC's contention that Defendants cannot meet this high bar may prove accurate, but resolving the issue at this stage would necessarily involve the resolution of disputed questions of fact, which is more appropriately addressed on summary judgment.
Accordingly, construing the facts in Plaintiffs' favor, the Court concludes that Plaintiffs have stated a plausible claim for direct damages in Counts One and Two of the Complaint.
IV. CONCLUSION
For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's AMEC Foster Wheeler Programs, Inc.'s Motion to Dismiss [Doc. 7] is DENIED.
IT IS SO ORDERED this 1st day of June, 2017.

Courts and scholars have used a number of other terms to describe a "contract to negotiate," including "Type II preliminary agreement," "preliminary commitment," and "agreement to negotiate." See Butler v. Balolia, 736 F.3d 609, 613 n.3 (1st Cir. 2013). For clarity's sake, the Court will refer to these agreements as "contracts to negotiate."

Although the parties dispute whether the Court of Appeals of Georgia addressed the enforceability of contracts to negotiate in TechBios, Inc. v. Champagne, 301 Ga. App. 592, 688 S.E.2d 378 (2009), the Court finds that case to be of little to no precedential value here. In TechBios, the Court of Appeals concluded that the alleged breach of a "teaming agreement," pursuant to which the the parties "agreed to identify business opportunities for their mutual benefit," was sufficient to set forth a claim for breach of contract under Georgia law. 301 Ga. App. at 593, 688 S.E.2d 378. In its complaint, the plaintiff in TechBios alleged that after he successfully "placed" one of the defendants with an Atlanta-based hotel company, the defendant "represented to [plaintiff] that he would use his best efforts to identify opportunities for [plaintiff] to conduct business with the hotel company," but later "refused to provide [plaintiff] with information regarding the work he was doing for the hotel company, and ... failed to disclose to [plaintiff] that he had secured technology business with the hotel company that could have been profitable to [plaintiff] if it had been able to participate." Id. The Court of Appeals did not describe the agreement in any greater detail.
AMEC argues that TechBios is distinguishable because, pursuant to the parties' teaming agreement, "[w]hen one party identified a business opportunity, the other had the right to participate ... [t]here were no other conditions in the teaming agreement that had to be fulfilled before a party's right to participate vested." Def.'s Reply to Pls.' Resp. to Mot. to Dismiss [Doc. 12] ("Def.'s Reply") at 15. Although this appears to be a correct reading of the facts in TechBios, the case leaves unanswered precisely what the defendant agreed to when he "represented to [plaintiff] that he would use his best efforts to identify opportunities for [plaintiff] to conduct business with the hotel company," TechBios, 301 Ga. App. at 593, 688 S.E.2d 378 -and thus fails to resolve whether (or to what extent) the underlying agreement was actually a contract to negotiate similar to one at issue here.
Furthermore, though AMEC repeatedly argues in its briefing that "agreements to agree" are unenforceable under Georgia law, it fails to recognize, much less address, the clear distinction courts have drawn between agreements to agree and contracts to negotiate (discussed infra ). See Def.'s Reply at 4-5. None of the cases cited by AMEC concerns a contract to negotiate akin to the one at issue here or those discussed in the case law. See Doll v. Grand Union Co., 925 F.2d 1363, 1365 (11th Cir. 1991) (concluding that letters between the parties, together with "many oral communications between them," were insufficient to constitute a contract where "numerous contractual issues remained to be resolved); Se. Underwriters, Inc. v. AFLAC, Inc., 210 Ga. App. 444, 446, 436 S.E.2d 556 (1993) (concluding that an acceleration clause in the parties' contract was "merely an agreement to negotiate in the future about the amount of commissions due," and therefore unenforceable); Se Grading, Inc. v. City of Atlanta, 172 Ga. App. 798, 324 S.E.2d 776 (1984) (holding that general contractor's submission of bid documentation listing plaintiff as a "potential" subcontractor was insufficient to demonstrate that the contractor assented to the terms set forth in the subcontractor's earlier bid); Malone Const. Co. v. Westbrook, 127 Ga. App. 709, 709, 194 S.E.2d 619 (1972) (holding that communications between the parties attached to the complaint "show[ed] nothing more than a continuing negotiation process with at most an agreement to contract in the future[.]").

The fundamental requirements for contract in Georgia are substantially similar to those in Washington (whose law was at issue in Butler). Compare Keystone, 94 P.3d at 949 (explaining that, for a valid contract to form in Washington, the parties must objectively manifest their mutual assent to the contract, the contract's terms must be sufficiently definite, and the contract must be supported by consideration) with Reindel v. Mobile Content Network Co., LLC, 652 F.Supp.2d 1278, 1287 (N.D. Ga. 2009) ("To constitute a valid contract [under Georgia law], there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate.") (quoting O.C.G.A. § 13-3-1and Farmer v. Argenta, 174 Ga. App. 682, 683, 331 S.E.2d 60 (1985) ("The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon.").

AMEC's attempt to distinguish the Teaming Agreement from the contracts to negotiate at issue in the cases discussed above fails for the same reason: though AMEC argues that none of these agreements "included limiting language comparable to Section I.B. of the Teaming Agreement, which specifically states 'this Agreement does not represent a guarantee of work to [Plaintiffs],' " Def.'s Reply at 14 (quoting Teaming Agreement § I.B), this argument yet again ignores the fundamental point that a contract to negotiate is just that: an enforceable promise to negotiate, rather than a guarantee of work.

The Court acknowledges that this conclusion is at odds with St. Joseph, in which another district court in this circuit concluded that, because it was "unclear whether Georgia courts would allow an independent claim based on an alleged breach of a letter of intent's promise to cooperate or whether this promise would be considered a part of the unenforceable agreement to agree," it was "unwilling to find in favor of Plaintiffs on the issue." St. Joseph, 2011 WL 1225577, at *14. But the dispute in St. Joseph centered on a letter of intent rather than the more formal contract to negotiate at issue here; furthermore, the court in St. Joseph did not acknowledge the many courts and authorities that have recognized contracts to negotiate, sources which courts elsewhere have relied on to divine unsettled state law. See, e.g., Burbach, 278 F.3d at 408-09 ("West Virginia law is silent as to whether it recognizes [contracts to negotiate], but following the modern trend in contract law, and many state courts that have recognized the pragmatism and commercial necessity of recognizing such agreements, we suspect that it would."); Butler, 736 F.3d at 616 (concluding that the Washington Supreme Court would "in all probability recognize the enforceability of contracts to negotiate" after surveying much of the same authority discussed above).
The Court also finds unpersuasive St. Joseph's conclusion (in a footnote) that Georgia courts would "more than likely [be] unwilling to enforce a duty to cooperate or negotiate in good faith where there is no binding contract as to the underlying transaction." 2011 WL 1225577, at *14 n. 25. In reaching this conclusion, the court relied on Miami Heights LT, LLC v. Home Depot U.S.A., Inc., 283 Ga. App. 779, 643 S.E.2d 1 (2007), in which the Court of Appeals of Georgia rejected the plaintiff's claim that the defendant breached its agreement, in a letter of intent, "to negotiate in good faith to finalize" an agreement to purchase a hospital. Miami Heights, 283 Ga. App. at 781 n. 5, 643 S.E.2d 1. But as St. Joesph itself recognized, the court in Miami Heights"[did] not explicitly address whether an independent claim could exist based on a promise to negotiate in good faith;" instead, the Court of Appeals rejected plaintiff's breach of contract claim because the letter of intent, as a whole, failed to clarify the issue of a deed restriction whose negotiation remained ongoing after the letter of intent was signed-thus rendering the letter an unenforceable "agreement to agree." St. Joseph, 2011 WL 1225577, at *14 n. 25 (citing Miami Heights, 283 Ga. App. at 783-84, 643 S.E.2d 1 ).
More importantly, the Court notes that the letter of intent at issue in Miami Heights, like the letter of intent in St. Joseph, has little in common with the contracts to negotiate contemplated by the caselaw and authority discussed in this order. As explained above, courts have recognized contracts to negotiate where the parties intend them as a means to protect their upfront investment in prolonged negotiations, especially where those negotiations involve considerable expense. Neither St. Joseph's nor Miami Heights' facts gives any indication that the letters of intent at issue had such a purpose, or that they were intended to protect a party against some comparable risk.

The preamble to the Teaming Agreement states in part:
WHEREAS, after careful consideration of their skills, capabilities and interests, the above identified parties have concluded that they would benefit from a teaming arrangement for the Project; and
WHEREAS, in the event of a contract award arising out of these premises, the parties intend to enter into an agreement whereby AMEC shall be the prime contractor and Subcontractor shall be the subcontractor. Subcontractor understands that AMEC may have other subcontractors.
NOW, THEREFORE, in consideration of the mutual promises hereinafter contained, the parties hereby agree as follows:
Teaming Agreement at 1.

In relevant part, the Teaming Agreement provides:
XI. Neither party shall be liable to the other for any special, incidental, or consequential damages including, without limitation, loss of revenue or profits, arising out of or relating to this Agreement or its performance or non-performance of obligations hereunder, whether such liability is based in contract, tort (including negligence), or otherwise.
Teaming Agreement § XI.